**COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.**
900 Third Avenue, 16th floor
New York, NY 10022-4728
(212) 752-8000
(212) 752-8393 Facsimile
Michael D. Warner, Esq. (TX Bar No. 792304)
John H. Drucker, Esq. (JD-2524)

Attorneys for the Official
Committee of Unsecured Creditors

Hearing Date:
July __, 2010 at __:00 __.m.

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>THE BROWN PUBLISHING COMPANY, et al.,[1]<br><br>                       Debtors. | Chapter 11<br><br>Case No. 10-73295 (DTE)<br><br>(Jointly Administered) |

**MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO PROHIBIT BANK GROUP FROM CREDIT BIDDING
PURSUANT TO BANKRUPTCY CODE SECTION 363(k)**

TO:    THE HONORABLE DOROTHY T. EISENBERG,
         UNITED STATES BANKRUPTCY JUDGE:

The Official Committee of Unsecured Creditors (the "Committee") of The Brown Publishing Company, *et al.* (collectively the "Debtors"), by and through its counsel, hereby submits this motion, pursuant to Section 363(k) of the Bankruptcy Code, to prohibit the Debtors' bank group from credit bidding in connection with the proposed acquisition of substantially all of the Debtors' assets (the "Motion"), and respectfully represents as follows:

---

[1] The Debtors are The Brown Publishing Company, Brown Media Holdings Company, ARG, LLC, Business Publications, LLC, Troy Daily News, Inc., The Delaware Gazette Company, Brown Publishing, Inc., LLC, Dan's Papers, Inc., Texas Community Newspapers, Inc., SC Biz News, LLC, Utah Business Publishers, LLC, Brown Business Ledger, LLC, Texas Business News, LLC, Upstate Business News, LLC, and Boulder Business Information, Inc.

**PRELIMINARY STATEMENT**

1.      There are 15 corporate debtors in these administratively consolidated chapter 11 Cases (the "Chapter 11 Cases"), each with its own assets. The Debtors fall within two separate holding companies, The Brown Publishing Company ("BPC"), which has 8 wholly owned debtor subsidiaries,[2] and Brown Media Holdings Company ("Media" or "BMH", and together with the remaining Debtors, are referred to collectively as "Brown") which has 5 wholly owned debtor subsidiaries.[3] Based upon the information contained in the Debtors' public disclosures, BPC and Media are unrelated other than that certain of the shareholders of BPC are also the shareholders of Media. Corporate organizational charts for BPC and for Media are attached hereto as Exhibit "A" and "B," respectively.

2.      Prior to August 2007, Media did not exist. As is discussed more fully below, pursuant to a June 2006 secured credit and loan facility entered into by BPC and its subsidiaries, as borrowers, and the Bank Group (as defined below), as lenders, BPC and its subsidiaries became indebted to the Bank Group for senior revolving and term loan indebtedness, which when paid down in September 2007 was outstanding in the amount of approximately of $75 million.

3.      According to *Declaration of Roy Brown, President and Chief Executive Officer of The Brown Publishing Company and Brown Media Holdings Company in Support of Debtors' Chapter 11 Petitions and First Day Pleadings*, filed on May 1, 2010 [Docket No. 3] (the "Brown Declaration"), at ¶ 7, certain shareholders of BPC created Media as an acquisition vehicle to

---

[2]     The Brown Publishing Company subsidiaries include: ARG, LLC; Troy Daily News, Inc.; The Delaware Gazette Company; SC Biz News, LLC; Utah Business Publishers, LLC; Brown Business Ledger, LLC; Texas Business News, LLC; and Upstate Business News, LLC.

[3]     Brown Media Holdings Company subsidiaries include: Brown Publishing, Inc., LLC; Dan's Papers, Inc.; Texas Community Newspapers, Inc; Business Publications, LLC and Boulder Business Information, Inc.

2

acquire and hold various business publications in New York, Ohio, Iowa and Texas. The Committee believes that the cost of the acquisitions by Media was approximately $33 million excluding any asset transfers between BPC and Media. Although all of these acquisitions were funded by a new $33 million loan from a new lending group (not the Bank Group or its members), Media and each of its newly formed subsidiaries upon their inception became "co-borrowers" with BPC on BPC's pre-existing debt of nearly $75 million. In connection therewith, the newly formed Media and its subsidiaries pledged their assets not only for the $33 million of new acquisition financing, but for the pre-existing debt, so that as of September 19, 2007, upon the closing of the financing, Media and each of its subsidiaries was jointly and severally liable for approximately $114 million of debt (the "September 2007 Loan Transactions").

4. Media and its subsidiaries received no value – much less reasonably equivalent value – for becoming direct obligors on the approximately $75 million of pre-existing debt of BPC and pledging their newly acquired assets as security for the debt of BPC – and were either insolvent when they entered into the September 2007 Loan Transactions or, undoubtedly, rendered them insolvent by the assumption of the debt of BPC. Furthermore, as the facts have borne out, when entering into the debt facility with the Bank Group, Media and its subsidiaries were about to engage in a business for which their remaining property and capital was insufficient to support operations. As such, the liens and claims asserted against Media and each of its newly formed subsidiaries, for BPC's already existing debt, were fraudulent transfers that can be avoided and thus the Bank Group's liens and claims are subject to a *bona fide* dispute – indeed they are in serious doubt.

5. As set out below, to be afforded the substantial benefit of credit bidding, a secured creditor must hold an allowed secured claim. Therefore, in circumstances – as is the case here –

where a creditor's claim is the subject of a *bona fide* dispute, that creditor may not credit bid that claim. The *bona fide* dispute warrants the Court exercising its discretion pursuant to Section 363(k) of the Bankruptcy Code, to deny the Bank Groups' stated intention of credit bidding its claim.

6. The Committee's right to object to the Bank Group's prepetition liens, claims and encumbrances does not expire until August 23, 2010.[4] The Committee is in the process investigating the Bank Group's alleged liens and security interests. Given the significant demonstration below of a *bona fide* dispute with respect to such liens and encumbrances allegedly held by the Bank Group, the privilege of a credit bid should not be afforded to the Bank Group.

7. Accordingly, consistent with Section 363(k) of the Bankruptcy Code and the case law below, "cause" exists to prohibit the Bank Group from credit bidding. Respectfully, therefore, the Committee requests that this Court prohibit the Bank Group from credit bidding.

## JURISDICTION

8. The Court has jurisdiction to consider the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this case in this district is proper under 28 U.S.C. §§ 1408 and 1409.

## GENERAL BACKGROUND

9. On April 30, 2010 and May 1, 2010 (the "Petition Date"), the Debtors each filed their respective voluntary petition for relief under Chapter 11 of Title 11 of the United States

---

[4] *See* Final DIP Financing Order (as defined and discussed below) at ¶ 21.

Code (the "Bankruptcy Code"). Pursuant to 11 U.S.C. §§ 1107(a) and 1108, each of the Debtors continues to operate its business and manage its property as a debtors in possession. By order dated May 5, 2010, the Court approved the joint administration of these Cases for procedural purposes only. [Docket No. 27].

10. On May 25, 2010, the Office of the United States Trustee appointed the Committee pursuant to Section 1102 of the Bankruptcy Code. The Committee selected Cole, Schotz, Meisel, Forman & Leonard, P.A. to serve as its counsel, and Argus Management Corporation to serve as its financial advisors.

11. According to the Debtors, BPC is a privately held community news and information corporation, organized under the laws of the State of Ohio that has grown to become one of the largest newspaper publishers in Ohio. In 2007, certain shareholders of BPC created Media, a corporation organized under the laws of the State of Ohio, to acquire certain business publications in New York, Ohio, Iowa and Texas.[5] The Debtors have asserted that through the first half of 2008, Brown continued to acquire publications outside of Ohio in, among other places, South Carolina, Texas, Colorado, and Arizona. *See* Brown Declaration, ¶ 7.

12. According to the Debtors, they currently publish fifteen (15) paid daily papers, thirty-two (32) paid weekly newspapers, eleven (11) paid business publications, forty-one (41) free newspapers, shoppers and niche publications and fifty-one (51) newspaper and niche websites. BPC also operates a substantial commercial printing operation, several event businesses and a stand alone database management company. According to the Debtors, they

---

[5] According to the Debtors, BPC is a C corporation and together with its subsidiaries files a consolidated federal income tax return. In contrast, the shareholders of Media have elected treatment as a small business corporation under subchapter S of the Internal Revenue Code and, as such, its profits and losses pass through to its shareholders for tax reporting purposes.

48374/0001-6868541v4

own geographically diverse newspapers located in urban, suburban and rural markets and commands a strong competitive position within each of these markets.

13. On May 4, 2010, only three (3) days following the Petition Date, the Debtors filed the *Debtors' Motion for Orders: (A)(I) Approving Auction Procedures and Related Bid Protections; (II) Scheduling a Hearing to Consider the Sale of the Debtors' Assets; and (B) Authorizing and Approving (I) the Sale of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances; (II) the Assumption of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* (the "Sale Motion"), pursuant to which the Debtors are seeking to sell substantially all of their assets (the "Sale"). [Docket No. 25].

14. On June 28, 2010, the Court entered its *Order (I) Approving Procedures for Sale of the Debtors' Assets; (II) Authorizing the Debtors to Grant Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale of Substantially All of the Debtors' Assets; and (IV) Approving the Form and Manner of Notices Related Thereto* (the "Bid Procedures Order"). [Docket No. 180]. The Bid Procedures Order sets forth, among other things, the following dates and deadlines for the Sale:

- July 16, 2010 – Bid submission deadline
- July 17, 2010 – Determination of Qualifying Bids
- July 19, 2010 – Auction
- July 20, 2010 – Objection deadline to the Sale Motion
- July 22, 2010 – Sale Hearing

**Prepetition Debt Structure**

15. As noted above, prior to late 2007, Media did not exist. Also, prior to September 2007, only the assets of BPC and its subsidiaries were pledged as collateral for certain indebtedness pursuant to a June 2006 secured credit and loan facility entered into by BPC and its subsidiaries, as borrowers, and the Bank Group (as defined below), as lenders, for senior

6

revolving and term loan indebtedness, which when paid down in September 2007 was outstanding in the amount of approximately of $75 million.[6]

16. In September 2007, BPC, its subsidiaries, and the then newly incorporated Media, and also its newly formed subsidiaries, entered into an Amended and Restated First Lien Credit Agreement, dated September 19, 2007, and an Amended and Restated First Lien Security Agreement, dated September 2007 (as such agreements may have been subsequently amended, hereinafter collectively referred to as the "First Lien Credit Agreement") with various financial institutions (collectively, the "Bank Group"), including, among others, NatCity and Wells Fargo Bank, N.A.[7] Under the First Lien Credit Agreement, the Bank Group is purported to have agreed to provide a revolving credit facility in the maximum principal amount of $10,000,000 and term loans in the aggregate principal amount of $81,000,000.[8]

17. In a recitation in the First Lien Credit Agreement, BPC and its subsidiaries – which are referred to as the "Existing Borrowers" – acknowledge that they owe the Bank Group approximately $74.7 million under a pre-existing lending arrangement. Pursuant to the First

---

[6] *See* Exhibit "D" hereto, being the loan closing statement of the use and source of funds in connection with the September 2007 Loan Transaction. [Because of certain confidentiality concerns, in an abundance of caution, this Exhibit is being redacted from the filed copies and service copies, other than the copies being served upon counsel for the Debtors, counsel for the Bank Group and the courtesy copy to be provided to the Court].

[7] The Committee understands that PNC Bank, National Association ("PNC") is the successor administrative and collateral agent under the First Lien Credit Agreement. *See* letter attached hereto as Exhibit "C", from Matthew Tashman, Esq, counsel to PNC, dated May 3, 2010, a copy of which was attached as "Exhibit A" to *the Limited Objection of PNC Bank, N.A. to Debtors Motion for Orders: (A)(I) Approving Auction Procedures and Related Bid Protections, etc.,* dated May 17, 2010 [Docket No. 61].

[8] According to the Debtors, they are also parties to a Second Lien Credit Agreement, dated September 19, 2007, with various lenders (the "Second Lien Lenders"), pursuant to which the Second Lien Lenders are purported to have extended term loans in the aggregate principal amount of $33,000,000 (which the Committee understands was utilized as acquisition financing for the assets acquired by the Media subsidiaries). The Committee has been advised that the Second Lien Lenders have waived any liens, security interests and pledges they may have otherwise held in the Debtors' assets and are, thus, unsecured creditors of the Debtors. Accordingly, the Second Lien Lenders are not the subject of this Motion, as the Second Lien Lenders no longer have any lien or security interest securing their claim as required by section 363(k) of the Bankruptcy Code and, thus, nothing to "credit bid." One of the Second Lien Lenders is the co-chair of the Committee.

48374/0001-6868541v4

Lien Credit Agreement, the newly formed Media and each of its subsidiaries agreed to become jointly and severally liable for this pre-existing indebtedness, though it is believed that the funding for the acquisition of the Media subsidiaries was derived primarily, if not exclusively, from the loans of the Second Lien Lenders.

18. In addition to assuming this crippling liability, Media and its subsidiaries granted the Bank Group liens and security interest in substantially all of their newly acquired assets as security for payment of the "obligation" already owed to the Bank Group by BPC.

19. Indeed, this assumed liability was more than twice the entire amount paid by Media for all of its acquisitions acquired from third parties. Neither Media nor its subsidiaries received any fair or reasonably equivalent consideration, from the Bank Group or BPC, in return for becoming jointly and severally liable for the debt owed to the Bank Group by BPC, which was clearly a debt Media and its subsidiaries had no reasonable ability to repay.

20. The assumption of such a large and existing obligation owed by BPC rendered Media and each of its subsidiaries insolvent. The Debtors and the Bank Group have taken the position that the assets of the Debtors are worth substantially less than the amounts claimed by the Bank Group to be owed to them.

21. As a result of the newly formed Media assuming the enormous pre-existing debt of BPC, the Bank Group received a fraudulent conveyance. Neither Media nor its subsidiaries received reasonably equivalent value in exchange for assuming the obligation of BPC, and they were either insolvent at the date they assumed the obligations or as a result of such assumption, became insolvent. In addition, as the facts have borne out, they were about to engage in business for which their remaining property, assets, and capital was unreasonably small.

22. Indeed, it appears from the documents that the Committee has been able to review so far that Media and its subsidiaries never received any consideration from the Bank Group when they assumed BPC's obligations. For example, as of the Petition Date the aggregate outstanding first lien debt owed by all of the Debtors of approximately $72 million was less than the amount of the first lien debt assumed by Media in September 2007 (approximately $75 million). Thus, from the date of the debt assumption by Media to the Petition Date, it appears that no net advances were made to Media or its subsidiaries.

23. As of May 1, 2010, the Debtors indicate that approximately $72.7 million was outstanding under the First Lien Credit Agreement (collectively, the "Prepetition Secured Indebtedness"). *See Final Order Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to § 364 of the Bankruptcy Code* entered July 2, 2010 [Docket No. 200] ( the "Final DIP Financing Order"), ¶¶ E(a), (c).

24. The Debtors have asserted that as of the Petition Date, the Prepetition Secured Indebtedness was allegedly secured by first priority and continuing pledges, liens and security interests granted by them to or for the benefit of the Bank Group in and upon substantially all of their property and assets. *Id*. ¶¶ E(b), (d).

**Debtor in Possession Financing**

25. After the Petition Date, the Debtors obtained a $2.5 million debtor in possession financing (the "DIP Facility") from PNC Bank, National Association, successor by merger to NatCity, as administrative agent for the Bank Group and the DIP lenders (collectively, the "DIP Lenders"). In accordance with the Final DIP Financing Order, the Court authorized the Debtors to enter into the DIP Facility.

26. Under the Final DIP Financing Order,

9

> the Committee shall have until August 23, 2010, or such later date as is agreed to by the Agent or ordered by the Court (the "Challenge Period") to commence an adversary proceeding or contested matter on behalf of the Committee or any Bankruptcy Estate, against the Pre-Petition Agent or Pre-Petition Lenders for the purpose of challenging the amount, validity, extent, priority, perfection, and enforceability of the Pre-Petition Debt or Pre-Petition Liens or otherwise asserting any claims or causes of action against the Pre-Petition Agent and/or Pre-Petition Lenders arising as a result of the relationship between the Debtors and Pre-Petition Lenders or otherwise relating in any way to the Pre-Petition Facility, including, but not limited to, any claims for preference, fraudulent conveyance or other claims arising under the Bankruptcy Code or applicable state or federal law. …

Final DIP Financing Order, ¶ 21.

27. Upon information and belief, at least as of the week beginning June 28, 2010, the Debtors had not yet drawn down any funds under the DIP Facility.

## LEGAL ARGUMENT

### THE COURT SHOULD PROHIBIT THE BANK GROUP FROM CREDIT BIDDING

28. Bankruptcy Code Section 363(k) permits secured lenders holding "allowed claims" to credit bid and to offset their claim against the purchase price of the sale property if they are the successful bidder – unless the Court "for cause" orders otherwise. The opportunity to credit bid is a right that is within the discretion of the Court, and is not absolute.

29. Section 363(k) of the Bankruptcy Code provides an obvious advantage among potential bidders to an existing lender because the lender is allowed to bid with its debt, rather than new cash. Courts thus must protect a debtor's estate from loss of value in those circumstances where a secured creditor's claim is subject to a *bona fide* dispute. As Courts have made clear, the language of Section 363(k) of the Bankruptcy Code permits a Court to specifically restrict the ability to credit bid. *See, e.g., In re NJ Affordable Homes Corp.*, No. 05-

10

60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006). *See also In re Theroux*, 169 B.R. 498, 499 n.3 (Bankr. D.R.I. 1994) ("[T]here is no absolute entitlement to credit bid.").

30. Thus, where "cause" is shown, the Court can restrict the ability of a secured creditor to credit bid.

31. "Cause" is not defined by Section 363(k) of the Bankruptcy Code, but is "intended to be a flexible concept enabling a court to fashion an appropriate remedy on a case-by-case basis." *In re NJ Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006).

32. "The intent of Section 363(k) is clearly to permit only those persons with a valid security interest in property to be sold to claim a setoff." *Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.)*, 44 B.R. 277, 279 (Bankr. D.V.I. 1984). The purpose of this requirement is to avoid the property being transferred to a putative secured creditor based on a credit bid only to subsequently have that creditor's lien deemed invalid.

33. Recognizing this purpose, Courts have denied the opportunity to credit bid when a *bona fide* dispute exists regarding the validity of the lien forming the basis for a credit bid. *See Nat'l Bank of Comm. v. L.D. McMullan (In re McMullan)*, 196 B.R. 818, 835 (Bankr. W.D. Ark. 1996) (holding that a secured creditor could not credit bid "because the validity of its liens and security interests are unresolved"); *Morgan Stanley Dean Witter Mortgage Capital, Inc. v. Alon USA L.P. (In re Akard St. Fuels, L.P.)*, No. 3:01-CV-1927-D, 2001 WL 1568332, at *3 (N.D. Tex. Dec. 4, 2001) (refusing a request to credit bid where the secured creditor's lien was subject to a bona fide dispute that could not be resolved before the sale). These holdings are based on the recognition that a bankruptcy estate would be harmed if credit bidding is allowed and the

48374/0001-6868541v4

purchaser's disputed lien is invalidated following the sale. *See In re McMullan*, 196 B.R. at 835.[9]

34. As noted above, the Challenge Period has not yet expired. However, based upon the Committee's investigation to date, the Committee has determined that Media and each of its subsidiaries assumed the already-existing obligations of BMC (totaling near $75 million) and pledged their newly acquired assets for those obligations, despite the fact that they did not receive any value – much less reasonably equivalent value – for taking on that liability and levering their assets for a debt they had no reasonable expectation that they could satisfy. As such, the Committee submits that the liens and claims granted to the Bank Group, at least with respect to the assets of Media and its subsidiaries, are fraudulent transfers and the liens and claims of the Bank Group on or against these entities and their assets will be avoided in an adversary proceeding that the Committee intends to file prior to the expiration of the Challenge Period.[10]

35. Such an action, if successful, would result in the avoidance of the Bank Group's claims, liens and security interests. Thus, the current status of the Bank Group's claims and liens are in serious doubt. Of course, with the impending deadlines set forth in the Bid Procedures Order (which is dictated by the relatively short time period imposed on the Debtors by the Bank Group), these claims will not be determined by the Court prior to the current bid and auction

---

[9] Some courts have allowed credit bidding when the party seeking to credit bid has offered to post an irrevocable letter of credit payable to the bankruptcy estate in the event that it loses a pending lien dispute, *In re Octagon Roofing*, 123 B.R. 583, 592 (Bankr. N.D. Ill. 1991), or when the party seeking to credit bid is "one of the largest financial institutions in the world" and has promised to pay cash and all accrued interest in the event that it loses the lien dispute, *Bank of Nova Scotia v. St. Croix Hotel Corp.* (*In re St. Croix Hotel Corp.*), 44 B.R. 277, 278-79 (Bankr. D.V.I. 1984).

[10] Of course, because the Challenge Period has not expired, the Committee reserves its rights to pursue all claims and causes of actions it may have to invalidate the Bank Group's liens and claims – whether on or against Media and its subsidiaries or upon Brown and its subsidiaries.

48374/0001-6868541v4

process set forth in the Bid Procedures Order. As a result, the Bank Group should not be allowed to credit bid their disputed claim.[11]

36. Moreover, because the Bank Group's alleged prepetition liens and security interests in the Debtors' property have not been proven to be valid,[12] the exercise of the Court's discretion under section 363(k) of the Bankruptcy Code to deny the credit bid, is appropriate. The Committee is in the process investigating the Bank Group's alleged liens and security interests and until such time as the Committee is satisfied with, or when the Bank Group establishes, the validity of their alleged liens and security interests, the privilege of a credit bid should not be afforded.[13]

37. Because of the particular facts and circumstances here, the Court should, as statutorily authorized in Section 363(k) of the Bankruptcy Code, prohibit credit bidding to the Bank Group.[14]

---

[11] Furthermore, in this case it is impossible for a credit bidder to prevail through a credit bid alone. There are significant cash requirements necessary to close the proposed sale, including cash to satisfy the current DIP Facility and contract cure amounts. Thus, a true credit bid involving no cash payment is impossible in these cases. *Cf. In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *16 (allowing credit bidding but requiring a secured lender to pay the "Buyers Premium" in cash pursuant to court's procedures order).

[12] As stated above, the Committee's right to object to the Bank Group's prepetition liens does not expire until August 23, 2010.

[13] In addition, the ability of the Bank Group to credit bid has a chilling affect on attracting competitive bidding. Potential competitive bidders may not want to expend the resources necessary to conduct due diligence and to obtain financing if the Bank Group is permitted to keep raising the bid by applying its debt rather than cash. To the extent it is later determined that the Banks Group's liens were avoidable in whole or in part, the Debtors' estates will have been prejudiced by this chilling effect. If the Bank Group is the successful bidder (for cash) and the Bank Group's liens are upheld, the Bank Group will not have been harmed, as it will get the money it bid back in repayment of the debt.

[14] In the event the Bank Group is allowed to credit bid, the Sale Order must make clear that their alleged liens and security interests are not *ipso facto* found valid by the entry of the Sale Order. According to *In re Radnor Holdings Corp.*, 353 B.R. 820 (Bankr. D. Del. 2006), unless this Court expressly reserves the Committee's rights, the entry of an order permitting a credit bid is tantamount to an order approving the nature, extent and validity of the lien claim and also prevents any litigation against the lender for avoidance, reduction, recharacterization, disallowance, disgorgement, counterclaim, surcharge, subordination, marshalling or other litigation claims. Thus, the Committee requests that if the Bank Group is allowed to credit bid, the Sale Order include the following language:

48374/0001-6868541v4

## RESERVATION OF RIGHTS

38. This Motion is not intended to address potential objections that the Committee may have to the Sale. The Committee, therefore, expressly reserves its rights to raise additional or further objections to the Sale, the Sale Motion, the stalking horse APA, any proposed purchaser, including the Bank Group, or any proposed Sale Order at or prior to the Sale Hearing.

## CONCLUSION

39. In addition to the chilling effect the Bank Group has caused by having an unfettered right to credit bid its $74+ million claims on other potential bidders (on assets the Debtors and its insiders acknowledge are worth dramatically less), "cause" is present here to prevent the Bank Group from credit bidding as the validity of the Bank Group's liens (at least with respect to those assets of Media) is in dispute and with respect to its liens and claims as a whole, has not yet been determined.

40. Accordingly, the Court should exercise its discretion, find "cause," and prohibit the Bank Group from credit bidding in connection with the currently scheduled proposed Sale. Importantly, the relief sought by the Committee is statutorily authorized, recognized by the applicable case law, and is appropriate under the circumstances.

---

The failure of the Committee to object to a bid put forth by the Bank Group or the DIP Lenders shall not (a) prejudice or impair the rights of the Official Committee of Unsecured Creditors (the "Committee"), in accordance with the Final DIP Financing Order, to challenge the nature, extent, validity, priority, perfection or amount of the Bank Group's and/or the DIP Lenders' alleged liens, security interests and claims or (b) release the Bank Group or the DIP Lenders from any causes of action which can be brought by or on behalf of the Debtors' estates relating to any of the foregoing.

41. A proposed form of order granting the relief sought herein is appended hereto as Exhibit "E".

**WHEREFORE**, the Committee respectfully requests that the Court grant the Motion; and enter an order substantially in the form appended hereto as Exhibit "E", and grant such other and further relief as the Court deems just and proper.

DATED: New York, New York
July 12, 2010

> Respectfully submitted,
>
> **COLE, SCHOTZ, MEISEL, FORMAN & LEONARD, P.A**.
> Attorneys for the Official Committee of Unsecured Creditors
>
> By:    */s/ John H. Drucker*
>       Michael D. Warner, Esq.
>       John H. Drucker, Esq.
>       900 Third Avenue, 16th floor
>       New York, NY 10022-4728
>       (212) 752-8000
>       (212) 752-8393