Matthew E. Tashman
Jeffrey L. Glatzer
Michael J. Venditto
Han J. Ahn
REED SMITH LLP
599 Lexington Ave
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
mtashman@reedsmith.com
jglatzer@reedsmith.com
mvenditto@reedsmith.com
hahn@reedsmith.com

*Attorneys for PNC Bank, N.A., as Administrative Agent*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | |
| | Chapter 11 |
| THE BROWN PUBLISHING COMPANY, | |
| DAN'S PAPERS, INC., | Case No. 10-73295 (DTE) |
| BROWN MEDIA HOLDINGS COMPANY, | |
| BOULDER BUSINESS INFORMATION INC., | (Jointly Administered) |
| BROWN BUSINESS LEDGER, LLC, | |
| BROWN PUBLISHING INC., LLC, | |
| BUSINESS PUBLICATIONS, LLC, | |
| THE DELAWARE GAZETTE COMPANY, | |
| SC BIZ NEWS, LLC, | |
| TEXAS COMMUNITY NEWSPAPERS, INC., | |
| TEXAS BUSINESS NEWS, LLC, | |
| TROY DAILY NEWS, INC., | |
| UPSTATE BUSINESS NEWS, LLC, | |
| UTAH BUSINESS PUBLISHERS, LLC, | |
| ARG, LLC, | |
| Debtors. | |

**OBJECTION OF PNC BANK, N.A. TO THE MOTION
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
TO PROHIBIT BANK GROUP FROM CREDIT BIDDING PURSUANT TO
<u>BANKRUPTCY CODE SECTION 363(k) (DOCKET NO. 258)</u>**

PNC Bank, N.A. ("PNC" or "Agent"), for itself and as administrative agent and collateral agent for both the pre-petition lenders (the "Lenders") and the post-petition lenders (the "DIP Lenders"), by and through its counsel, Reed Smith LLP, hereby submits this objection (the "Objection") to the Motion of the Official Committee of Unsecured Creditors (the "Committee") to Prohibit Bank Group from Credit Bidding Pursuant to Bankruptcy Code Section 363(k) (the "Motion") and respectfully represents as follows:

## SUMMARY OF OBJECTION

1. Since the commencement of these cases, the Agent and the Lenders have made clear to all parties, including the Committee, that the Lenders intend to credit bid for the Debtors' assets in order to insure that fair value is received at any sale. Despite the Committee's longstanding awareness of the Lenders' intentions, the Committee waited until days before the deadline for submitting bids for the Debtors' assets to request, on an artificially created "emergency basis", that this Court prohibit the Lenders from credit bidding.

2. In support of its request, the Committee does not allege any inappropriate conduct by the Agent or the Lenders. Rather, the Committee merely states that it is investigating possible fraudulent conveyance claims against the Lenders and, accordingly, a credit bid by the Lenders should not be allowed in light of their ongoing investigation.

3. As a preliminary manner, this Court should not sanction the "ambush" tactics of the Committee, allowing them to create "emergencies" requiring hearings on the day prior to one of the most critical days of these bankruptcy cases – the Debtors' bid deadline. Second, as described in greater detail below, there is no merit to the Committee's fraudulent conveyance claims and no basis to limit the Lenders' right to credit bid under Section 363(k) of the Bankruptcy Code. Notably, the Committee has failed to disclose in its pleadings that the

Lenders provided substantial and material additional consideration to the Debtors in return for the liens that the Committee proposes to challenge. Third, if the Committee believes they have legitimate fraudulent conveyance claims against the Lenders, the Committee can commence an adversary proceeding against the Lenders to challenge their liens and claims. The Committee's "concern" about potential claims that are still being investigated does not, by itself, constitute "cause" for prohibiting the Lenders from credit bidding.

## BACKGROUND

4. On April 30, 2010 and May 1, 2010 (collectively, the "Petition Date"), Brown Publishing Company ("BPC"), Brown Media Holdings Company ("BMHC") and each of their debtor subsidiaries (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Eastern District of New York (the "Court").

5. The Debtors' Chapter 11 cases (collectively, the "Bankruptcy Cases") are being jointly administered pursuant to an Order entered by this Court on May 5, 2010. The Debtors are presently acting as debtors in possession and operating their respective businesses as such.

6. On May 4, 2010, the Debtors filed their Motion for Orders (A)(I) Approving Auction Procedures and Related Bid Protections; (II) Scheduling a Hearing to Consider the Sale of the Debtors' Assets; and (B) Authorizing and Approving the (I) Sale of the Debtors' Assets Free and Clear of Liens, Claims and Encumbrances; and (II) the Assumption of Certain Executory Contracts and Unexpired Leases; and (III) Granting Related Relief (Docket No. 25) (the "Sale Motion"). Pursuant to the Sale Motion, the Debtors sought approval of certain bid procedures and, ultimately, the approval of a sale of substantially all of their assets, as more specifically set forth therein.

7.  On May 25, 2010, the Office of the United States Trustee appointed the Committee pursuant to Section 1102 of the Bankruptcy Code. See Appointment of the Official Consolidated Committee of Unsecured Creditors (Docket No. 99).

8.  On June 28, 2010, the Court entered its Order (I) Approving Procedures for Sale of the Debtors' Assets; (II) Authorizing the Debtors to Grant Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale of Substantially All of the Debtors' Assets; and (IV) Approving the Form and Manner of Notices Related Thereto (Docket No. 180) (the "Bid Procedures Order"). The Bid Procedures Order recognizes that PNC possesses the ability to submit a credit bid for all or any portion of the Debtors' Assets. See Exhibit A to Bid Procedures Order at p. 5 ("Pursuant to 11 U.S.C. § 363(k), any credit bid submitted by PNC for all or any portion of the Assets must be submitted by the Bid Deadline, in accordance with the terms of the Sale Procedures. Any such credit bid shall be governed by the Sale Procedures…"). Furthermore, the Bid Procedures Order sets, inter alia, a July 16, 2010 deadline for the submission of bids, an auction for July 19, 2010, and a Sale Hearing on July 22, 2010.

9.  On July 12, 2010, the Committee filed the Motion. Notwithstanding the fact that the Agent is entitled to credit bid under both Section 363(k) of the Bankruptcy Code and the Bid Procedures Order, the Committee seeks to prohibit the Agent from submitting any credit bid in connection with the proposed sale of the Debtors' assets.

10. As noted in the Motion, BPC and BMHC are two separate holding companies; BPC is the 100% owner of eight debtor subsidiaries and BMHC is the 100% owner of five debtor subsidiaries.

11. Pursuant to a Credit Agreement dated June 29, 2006 (the "Prior Credit Agreement"), the Agent and the Lenders made available to BPC and certain other Debtors

- 4 -

certain revolving and term loan credit facilities. Thereafter, certain shareholders of BPC sought additional loans from the Lenders in order to fund acquisitions of additional assets (primarily the Debtors' "Dan's Papers" business and certain business publications).

12. Such shareholders later determined, however, that in lieu of the Lenders providing such funding to BPC, the funding should be provided to a newly-created entity, BMHC.

13. Ultimately, two credit facilities were provided on a joint and several basis to BPC, BMHC and their collective subsidiaries. Those credit facilities consisted of: (i) that certain Amended and Restated First Lien Credit Agreement dated September 19, 2007 (the "First Lien Credit Agreement", and together with the documents executed in connection therewith, the "Pre-Petition Loan Documents") made by the Lenders, and (ii) that certain Second Lien Credit Agreement dated September 19, 2007 (the "Second Lien Credit Agreement") made by certain second-lien lenders.

14. As evidenced by the Closing Authorization attached as Exhibit D to the Motion, the Lenders provided a $91 million credit facility to the Debtors consisting of an $81 million term loan and a $10 million revolving line of credit. As further evidenced by the Closing Authorization, the proceeds of the First Lien Credit Agreement were used to repay approximately $74.7 million outstanding under the Prior Credit Agreement and to provide the Debtors (including BMHC and its subsidiaries) with approximately $16.3 million of new credit availability. Lastly, as set forth in the Closing Authorization, the Debtors (including BMHC and BPC) were provided with $33 million of funding pursuant to the Second Lien Credit Agreement.

15. In addition to the $16.3 million of new credit provided by the Lenders, the First Lien Credit Agreement provided the Debtors the option to increase the First Lien credit facilities by up to an additional $25 million.

16. By its Motion, the Committee argues that this Court should prohibit the Lenders from credit bidding, notwithstanding that both 363(k) of the Bankruptcy Code and the Bid Procedures Order authorize the Lenders to credit bid. Specifically, the Committee asserts that it has raised "a *bona fide* dispute" as to the validity of the Lenders' first priority liens and security interests in the assets of BMHC and its wholly owned subsidiaries. Motion at pp. 3-4, ¶¶ 4-5. The Committee contends that BMHC and its subsidiaries allegedly "received no value – much less reasonably equivalent value – for becoming direct obligors on the approximately $75 million of pre-existing debt of BPC and pledging their newly acquired assets as security for the debt of BPC," leaving BMHC with "a debt they had no reasonable expectation that they could satisfy." Id. at pp. 4, 12, ¶ 4, 34.

17. Based on their speculation that the Lenders' first priority liens and security interests in BMHC's assets may be invalid, the Committee maintains that "the privilege of a credit bid should not be afforded" to the Lenders while the Committee investigates the Lenders' liens and security interests. Motion at p. 13, ¶ 36.

18. As shown below, however, the Committee's request has no basis in fact or law and must be rejected. Quite simply, no "cause" exists under section 363(k) of the Bankruptcy Code to enjoin PNC from exercising its right to credit bid its secured claim in accordance with the Bid Procedures Order and the Motion should be denied.

**OBJECTION**

19. Section 363(k) of the Bankruptcy Code provides:

> At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. 363(k). Thus, in "the ordinary case…a secured creditor has the opportunity to credit bid its entire claim in a sale under § 363(b) of the Code, although § 363(k) gives the court discretion to deny the ability to credit bid for 'cause.'" In re NJ Affordable Homes Corp., No. 05-60442 (DHS), 2006 WL 2128624, at *16 (Bankr. D.N.J. June 29, 2006).

20. While the term "cause" is not defined in Section 363 of the Bankruptcy Code, id., it clearly does not exist in instances of unsubstantiated speculation that the liens and security interests underlying a secured creditor's claim *might* be later challenged on a fraudulent transfer theory.

21. The Committee has not provided any evidence to substantiate its claims. Rather, the conclusions reached by the Committee in the Motion rely solely on the unfounded hope that the Lenders' liens and perfected security interests in BMHC's assets constitute fraudulent transfers.[1]

22. First, contrary to the Committee's assertions, the Debtors, including BMHC, did receive new cash consideration upon entering into the First Lien Credit Agreement. As noted above, under the First Lien Credit Agreement, the Lenders provided a revolving credit facility in the maximum principal amount of $10 million and term loans in the aggregate principal amount of $81 million; moreover, the Debtors were granted the option to receive an incremental $25 million pursuant to the express terms of the First Lien Credit Agreement. Thus, $91 million plus an additional incremental $25 million was made available to the Debtors under the First Lien Credit Agreement. Only approximately $74.7 million of these funds were used to pay down BPC's pre-existing indebtedness to the Lenders under the Prior Credit Agreement. Therefore,

---

[1] By addressing the Committee's fraudulent transfer theory, PNC does not concede that the Committee may avail itself of Section 548, Section 550 or any other sections of the Bankruptcy Code.

simple arithmetic demonstrates that approximately $16.3 million was immediately made available to the Debtors, including BMHC, with the ability to request up to $25 million in additional funding

23. Furthermore, BMHC received additional "value" upon entering into the First Lien Credit Agreement; namely the opportunity to seek and the ability to obtain financing from other third party lenders. As noted in the Motion, in September 2007, the Debtors entered into the Second Lien Credit Agreement, which provided the Debtors with access to loans in the aggregate principal amount of $33 million from various lenders. See Motion at p. 7, ¶ 16 n.8. Without the consent of the First Lien Lenders, BPC would not have been able to be a co-borrower under the Second Lien Credit Agreement and would not have been able to pledge its assets as collateral to secure the $33 million of funding under the Second Lien Credit Agreement. Upon information and belief, BMHC, a newly-formed company with no assets or track record would not have been able obtain any meaningful financing, let alone the $33 million provided under the Second Lien Credit Agreement, without the co-borrower support of BPC. And it is beyond dispute that non-cash consideration—such as the opportunities to procure further financing as a result of the First Lien Credit Agreement—constitutes additional "value" provided to BMHC. See Pension Transfer Corp. v. Beneficiaries Under the Third Amendment to Fruehauf Trailer Corp. Retirement Plan No. 003, 319, B.R. 76, 86 (D. Del. 2005) (noting that "value" for fraudulent transfer purposes under the Bankruptcy Code "includes 'any benefit' to the debtor, 'direct or indirect'" and that the "mere 'opportunity' to receive an economic benefit in the future constitutes 'value' under the Code" (quoting Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors (In re R.M.L., Inc.), 92 F.3d 139, 148, 150 (3d Cir. 1996); Metro Commc'ns, Inc. v. Comm. of Unsecured Creditors, 945 F.2d 635, 646 (3d Cir. 1991))). It is difficult, at best, to understand the

basis for the Committee's speculation that its "investigation" of the Lenders' liens against BMHC will turn up anything other than that such liens are completely valid and enforceable.

24. In any event, it is indisputable that BMHC received value in the form of access to approximately $16.3 million of immediate new consideration from the Lenders under the First Lien Credit Agreement, plus the ability to request up to $25 million of incremental funding. Accordingly, in the Committee's best case analysis, the Lenders should be permitted to credit bid up to $41 million for the Debtors' assets which are owned by BMHC and its subsidiaries.

## **CONCLUSION**

The Committee has requested that the Lenders' right to credit bid be denied for "cause". As outlined above: (i) no "cause" exists for such a denial and, in fact, the Lenders provided meaningful consideration for the liens the Committee is "investigating"; and (ii) the Committee has another avenue for challenging the Lenders' liens; the commencement of an adversary proceeding (if one is warranted). In light of the foregoing, the Committee's Motion should be denied.

WHEREFORE, for the foregoing reasons, PNC Bank, N.A. respectfully requests that this Court (i) deny the Committee's Motion[2] and (ii) grant such other and further relief as is just and proper.

---

[2] It is the position of PNC that Committee Counsel's fees and expenses in connection with the preparation, filing, and prosecution of the Motion do not qualify for reimbursement from the limited carve-out for professional fees and disbursements incurred by the Committee (the "Carve-Out") as the DIP Order and the Cash Collateral Order provide that the Carve-Out "shall not include professional fees and disbursements incurred in connection with the commencement and prosecution of any adversary proceedings or contested matter in which any party asserts any claims or causes of action against…and/or challenges or raises any defense" to the Lenders' liens or claims. Counsel for PNC has advised Committee Counsel of such position. See July 13th Letter, at pp. 1-2, a true and correct copy of which is attached as Exhibit A to the Declaration of Jeffrey L. Glatzer In Support of the Objection of PNC Bank, N.A. to the Motion.

Dated: July 14, 2010  Respectfully Submitted
New York, New York  REED SMITH LLP

 */s/ Matthew E. Tashman*
Matthew E. Tashman
Jeffrey L. Glatzer
Michael J. Venditto
Han J. Ahn
REED SMITH LLP
599 Lexington Ave
New York, New York 10022
Telephone: (212) 521-5400
Facsimile: (212) 521-5450
mtashman@reedsmith.com
jglatzer@reedsmith.com
mvenditto@reedsmith.com
hahn@reedsmith.com

*Attorneys for PNC Bank, N.A., as Administrative Agent*