Edward M. Fox
Eric T. Moser
K&L GATES LLP
599 Lexington Avenue
New York, NY 10022
(212) 536-3900

Counsel for Debtors,
The Brown Publishing Company, *et al.*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------X

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| THE BROWN PUBLISHING COMPANY, | : | Chapter 11 |
| DAN'S PAPERS, INC., | : | Case No. 10-73295 (DTE) |
| BROWN MEDIA HOLDINGS COMPANY, | : | (Jointly Administered) |
| BOULDER BUSINESS INFORMATION INC., | : | |
| BROWN BUSINESS LEDGER, LLC, | : | |
| BROWN PUBLISHING INC., LLC, | : | |
| BUSINESS PUBLICATIONS, LLC, | : | |
| THE DELAWARE GAZETTE COMPANY, | : | |
| SC BIZ NEWS, LLC, | : | |
| TEXAS COMMUNITY NEWSPAPERS, INC., | : | |
| TEXAS BUSINESS NEWS, LLC, | : | |
| TROY DAILY NEWS, INC., | : | |
| UPSTATE BUSINESS NEWS, LLC, | : | |
| UTAH BUSINESS PUBLISHERS, LLC, | : | |
| ARG, LLC, | : | |
|         Debtors. | : | |

-------------------------------------------------------X

### DEBTORS' OBJECTION TO MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO PROHIBIT BANK GROUP FROM CREDIT BIDDING PURUSANT TO BANKRUPTCY CODE SECTION 363(k)

The Brown Publishing Company ("BPC"), Brown Media Holdings Company ("BMH") and their respective debtor subsidiaries in these jointly administered chapter 11 cases (collectively, the "Debtors"), by their attorneys, K&L Gates LLP, hereby object to the Motion of

the Official Committee of Unsecured Creditors to Prohibit Bank Group From Credit Bidding Pursuant to Bankruptcy Code Section 363(k) (the "Motion"), and in support thereof respectfully state as follows:

## PRELIMINARY STATEMENT

1. The Official Committee of Unsecured Creditors (the "Committee"), having failed in its previous efforts to derail the Debtors' sale process, attempts to achieve the same goal by moving to prohibit the Debtors' pre-petition secured first lien lenders from credit bidding on the Debtors' assets.

2. The Committee is welcome to challenge the lenders' liens, but the Motion is premature, procedurally deficient and threatens to undermine the sale process without any justification.

3. This Court has already authorized the lenders to credit bid. Consequently, the Committee cannot simply use the Motion take another bite at the apple. Instead, the Committee must make a motion to alter or amend a judgment pursuant to Rule 9023 of the Federal Rules of Bankruptcy Procedure, which would be subject to the stringent standard of review applied to motions brought under that rule.

4. The Committee has until August 23, 2010 to challenge the validity of the lenders' liens and the Debtors are not taking sides in any potential adversary proceeding that the Committee might bring against the lenders. Unless and until the Committee successfully challenges the Liens, however, the liens are valid and the lenders are entitled to credit bid.

5. The Debtors cannot afford any deviation from the schedule established under the bid procedures order entered by this Court. They must close the sale of their assets by July 30, 2010, when the Debtors' DIP financing terminates.

6. The lenders' participation in the sale process is critical to the Debtors' ability to maximize the value of their assets, as the lenders have stated that they intend to credit bid $20,000,000 for the Debtors' assets, which exceeds the price that the Debtors' stalking horse bidder has agreed to pay. If the Motion is granted and the Lenders are not permitted to participate in the Auction, in whole or in part, the Debtors' ability to obtain the highest and best offer or offers for their assets will be threatened.

7. The far more logical and sensible approach, which is supported by case law, is to allow the lenders to credit bid because they will be able to pay cash to the Debtors estates later for any assets that they purchase if the Court should eventually determine that their liens are invalid.

8. Because the Committee has provided no rational justification for prohibiting the lenders from credit bidding for the Debtors' assets, the Motion should be denied.

## BACKGROUND

### A. The Debtors and Their Bankruptcy Cases

9. On April 30 and May 1, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

10. BPC is a privately held community news and information corporation, organized under the laws of the State of Ohio, that has grown to become one of the largest newspaper publishers in Ohio. In 2007, certain shareholders of BPC created BMH, a corporation organized under the laws of the State of Ohio, to acquire certain business publications in New York, Ohio, Iowa and Texas. Through the first half of 2008, the Debtors continued to acquire

publications outside of Ohio in, among other places, South Carolina, Texas, Colorado, and Arizona.

11. The Debtors own geographically diverse newspapers located in urban, suburban and rural markets and command a strong competitive position within each of these markets. Debtors currently publish fifteen (15) paid daily papers, thirty-two (32) paid weekly newspapers, eleven (11) paid business publications, forty-one (41) free newspapers, shoppers and niche publications and fifty-one (51) newspaper and niche websites. The Debtors also operate a substantial commercial printing operation, several event businesses and a stand alone database management company.

12. Debtors' publications have a very loyal readership, provide in-depth local market coverage and possess high audience penetration rates and a high demographic quality of readers. Debtors' publications, therefore, are an attractive and cost-effective means for advertisers to reach targeted customers.

    B.    **The Pre-Petition Secured Loans**

13. Prior to the Petition Date, BPC, BMH and each of their subsidiaries, as borrowers (the "Borrowers"), were parties to an Amended and Restated First Lien Credit Agreement, dated September 19, 2007 (as amended, the "First Lien Credit Agreement"), with National City Bank, in its capacity as administrative and collateral agent for the financial institutions from time to time parties to that agreement as lenders (the "First Lien Lenders"), and Wells Fargo Bank, N.A., as syndication agent. Under the First Lien Credit Agreement, the First Lien Lenders provided the Borrowers with a revolving credit facility in the maximum principal amount of $10,000,000 and term loans in the aggregate principal amount of $81,000,000.

14. As of the Petition Date, the outstanding amount under the First Lien Credit Agreement, including unpaid interest and fees, was approximately $72,727,041.01.

15. Prior to the Petition Date, the Borrowers were also parties to a Second Lien Credit Agreement, dated September 19, 2007 (as amended, the "Second Lien Credit Agreement"; together with the Amended and Restated First Lien Credit Agreement, the "Pre-Petition Credit Agreements"), with National City Bank, in its capacity as administrative and collateral agent for the financial institutions from time to time parties to that agreement as lenders (the "Second Lien Lenders"). Under the Second Lien Credit Agreement, the Second Lien Lenders extended term loans to the Borrowers in the aggregate principal amount of $33,000,000.

16. As of the Petition Date, the outstanding amount under the Second Lien Credit Agreement, including unpaid interest and fees, was approximately $24,300,336.12.

17. The collateral securing the obligations under the Pre-Petition Credit Agreements consists of, among other things, receivables, cash, collateral accounts, deposit accounts, contracts and contract rights, equipment, general intangibles, goods, inventory and investment property (the "Pre-Petition Collateral").

18. The Borrowers defaulted under both of the Pre-Petition Credit Agreements and, prior to the Petition Date, operated under forbearance agreements to the Pre-Petition Credit Agreements.

19. PNC Bank, N.A. ("PNC") is the successor agent to National City Bank under the First Lien Credit Agreement. Wilmington Trust Company is the successor agent to National City Bank under the Second Lien Credit Agreement.

C. **The Sale Procedures Order**

20. On June 28, 2010, the Court entered an Order (I) Approving Procedures for Sale of the Debtors' Assets; (II) Authorizing the Debtors to Grant Certain Bid Protections; (III) Scheduling a Hearing to Consider the Sale of Substantially All of the Debtors' Assets; and

(IV Approving the Form and Manner of Notices Related Thereto (the "Sale Procedures Order") (Docket No. 180).

21. Pursuant to the Sale Procedures Order, the deadline to submit bids for the Debtors' assets is July 16, 2010 at 2:00 p.m. EDT; the Debtors will conduct an auction (if the Debtors receive at least one "Qualified Bid" in addition to the stalking horse bid) on July 19, 2010 at 10:00 a.m. EDT; the deadline to objection to any sale of the Debtors' assets is July 20, 2010 at 5:00 p.m. EDT; and a sale hearing will occur on July 22, 2010 at 2:00 p.m. EDT.

22. The Sale Procedures approved as Exhibit A to the Sale Procedures Order contain the following provision:

> **I. Credit Bids** – Pursuant to 11 U.S.C. § 363(k), any credit bid submitted by PNC for all or any portion of the Assets must be submitted by the Bid Deadline, in accordance with the terms of the Sale Procedures. Any such credit bid shall be governed by the Sale Procedures, provided however, that PNC shall not be required to submit a Good Faith Deposit in connection with any credit bid on the Debtors' Assets.

Id., Ex. A, ¶ I.

D. **Cash Collateral and DIP Financing**

23. On July 2, 2010, the Court entered (i) a Final Order Pursuant to Sections 105, 361, 362 and 363 of the Bankruptcy Code Authorizing the Use of Cash Collateral and Granting Adequate Protection (the "Final Cash Collateral Order") (Docket No. 199) and (ii) a Final Order Authorizing Secured Post-Petition Financing on a Superpriority Basis Pursuant to § 364 of the Bankruptcy Code (the "DIP Financing Order") (Docket No. 200).

24. The Final Cash Collateral Order provides, as a form of adequate protection for any diminution in the value of the first lien lenders' interest in prepetition collateral,

> "The Agent and Lenders shall have the right to credit bid the entire amount of the Prepetition Obligations then outstanding at any sale conducted in these Bankruptcy Cases, whether such sale is pursuant to §§ 363, 1129 of the Bankruptcy Code or otherwise."

Final Cash Collateral Order ¶ 5(iii).

25. The DIP Financing Order authorizes the Debtors, among other things, to enter into a DIP Credit Agreement with the Agent and various lending institutions that are "Lenders" under the Debtor-In-Possession Credit Agreement that was included as an exhibit to the Notice of Filing that the Debtors filed on June 11, 2010 (the "DIP Credit Agreement") (Docket No. 140). DIP Financing Order ¶ 2(a). The Lenders under the DIP Credit Agreement comprise the same lending institutions as the First Lien Lenders.

26. Under the DIP Credit Agreement, the Lenders will provide the Debtors with up to $2,500,000 in debtor-in-possession ("DIP") financing on a revolving basis. DIP Credit Agreement § 1.1 (definition of "Commitment Amount"). The Debtors, however, are not permitted to draw under the DIP Credit Agreement if they will have immediately available cash on hand of at least $500,000, inclusive of the amount that the Debtors propose to borrow, after payment of any particular expenditure. DIP Credit Agreement § 2.3.

27. Pursuant to the DIP Financing Order, the DIP financing facility will terminate no later than July 30, 2010. DIP Financing Order ¶ 7.

## ARGUMENT

**A. The Committee Must Move Pursuant to Fed. R. Bankr. P. 9023 to Alter or Amend the Sale Procedures Order and the Final Cash Collateral Order, Both of Which Authorize the First Lien Lenders to Credit Bid**

28. Pursuant to Fed. R. Bankr. P. 9023, which incorporates Fed. R. Civ. P. 59 into cases under the Bankruptcy Code (with exceptions that are not applicable here), "A motion . . . to alter or amend a judgment shall be filed . . .no later than 14 days after entry of judgment." Fed. R. Bankr. P. 9023.

29. "A motion to alter or amend a judgment pursuant to F.R. Civ. P. 59(e) may be based upon (1) an intervening change in the controlling law, (2) the availability of new

7

evidence, (3) to correct manifest errors of law or fact upon which the judgment is based or (4) to prevent manifest injustice." Official Committee of Unsecured Creditors of Enron Corp. v. Martin (In re Enron Creditors Recovery Corp.), 378 B.R. 54, 56-57 (Bankr. S.D.N.Y. 2007). "The standard under Rule 59 is a strict one." In re Jamesway Corp., 203 B.R. 543, 546 (Bankr. S.D.N.Y. 1996).

30.     The Final Cash Collateral Order states that the First Lien Lenders "shall have the right to credit bid" on the Debtors' assets. Final Cash Collateral Order ¶ 5(iii). The Sale Procedures Order also clearly authorizes a credit bid by the First Lien Lenders. Sale Procedures Order, Ex. A, ¶ I.

31.     Therefore, if the Committee wants the Court to prohibit the First Lien Lenders from submitting a credit bid,[1] it must move to alter or amend the Final Cash Collateral Order and the Sale Procedures Order pursuant to Fed. R. Bankr. P. 9023. The Committee cannot, however, bypass the clear requirements of the Federal Rules of Bankruptcy Procedure by simply moving for relief under the Bankruptcy Code on an issue on which the Court has already entered an order.

32.     Even if the Court were to treat the Motion as a motion to alter or amend, the Motion would fall woefully short of the strict standards of Rule 59. The Committee has raised new arguments that it should have raised, but did not, in its objections to the Debtors'

---

[1] It is unclear whether the Committee seeks to prevent the First Lien Lenders from credit bidding only for the assets of BMH and its subsidiaries, or for both those assets and the assets of BPC and its subsidiaries. At several places in the Motion, the Committee appears to indicate that it is only seeking to prevent a credit bid for the assets of BMH and its subsidiaries: "As such, the liens and claims asserted against Media and each of its newly formed subsidiaries, for BPC's already existing debt, were fraudulent transfers…." (Motion ¶ 4); "'cause' is present here to prevent the Bank Group from credit bidding as the validity of the Bank Group's liens (at least with respect to those assets of Media) is in dispute and with respect to its liens and claims a whole, has not yet been determined" (Motion ¶ 39). In any event, if the Court were to grant the Motion, the prohibition on credit bidding should only extend to the assets of BMH and its subsidiaries, as the Motion does not unambiguously request that the Court prohibit the First Lien Lenders from credit bidding on the assets of BPC and its subsidiaries.

motions for authorization to use cash collateral and for entry of the Sale Procedures Order, and has "fail[ed] to demonstrate any manifest errors or injustice, newly discovered evidence or change in controlling law" that would now justify altering or amending the Court's prior orders. IBI Fund Liquidating, LLC v. Chadmoore Wireless Group, Inc. (In re Interbank Funding Corp.), 2007 WL 2080512, at *2 (Bankr. S.D.N.Y. July 19, 2007); see also In re Robotic Vision Sys., Inc., 2006 WL 2728620, at *8-*9 (Bankr. D.N.H. Sept. 13, 2006) (denying motion to amend cash collateral order because, among other things, "No one has even remotely come close to a manifest error of law").

33. In fact, the Committee *twice* submitted proposed forms of final orders authorizing the Debtor's use of cash collateral, both of which contained, verbatim, the provision in the Final Cash Collateral Order authorizing the First Lien Lenders to credit bid. The Committee, despite making other, extensive changes to the Debtors' proposed form of order authorizing the use of cash collateral, did not propose to alter a single word of the provision explicitly authorizing the First Lien Lenders to credit bid. See Supplemental Objection of the Official Committee of Unsecured Creditors to Debtors' Motion for Order (A) Authorizing Debtors to Obtain Post-Petition Financing and Grant Security Interests and Superpriority Administrative Expense Status Pursuant to 11 U.S.C. §§ 105 and 364(c); (B) Authorizing the Debtors to Use Cash Collateral Pursuant to 11 U.S.C. § 363; (C) Modifying the Automatic Stay Pursuant to 11 U.S.C. § 362; (D) Authorizing the Debtors to Enter into Agreements with PNC Bank, N.A., as Agent for Itself and Certain Other Lenders; and (v) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and 4001(c) (Docket No. 144), Ex. B, ¶ 5(iii); Proposed Counter Orders and Statement of Creditors' Committee (A) In Opposition to Debtors' Proposed Orders, and (B) In Support of Creditors' Committee's Proposed Counter-Orders Re (1) Final Order Authorizing Secured Postpetition Financing on a Super Priority Basis and (2) Final Order

Authorizing Use of Cash Collateral and (C) Setting Forth Authority for this Court to Allocate Carve-Out (Docket No. 172), Ex. B, ¶ 5(iii).

34. Moreover, the Committee has not even attempted to show (nor could it show) that, since the Court authorized the First Lien Lenders to credit bid under the Final Cash Collateral Order and the Sale Procedures Order, there has been an intervening change in the controlling law, new facts have come to light or that the Court committed a manifest error of law or fact in authorizing the First Lien Lenders to credit bid.

35. In addition, a motion for relief from the Final Cash Collateral Order or the Sale Procedures Order under Fed. R. Civ. P. 60(b), which applies in cases under the Bankruptcy Code pursuant to Fed. R. Bankr. P. 9024, would likewise fail.

36. Where "a motion for reconsideration is filed after the [14]-day period [applicable under Fed. R. Bankr. P. 9023] has expired, courts should treat the motion as a Bankr. Rule 9024 or Civ. Rule 60 motion." In re Enron Corp., 352 B.R. 363, 367-68 (Bankr. S.D.N.Y. 2006).

37. Fed. R. Civ. P. 60(b), made applicable to bankruptcy cases by Fed. R. Bankr. P. 9024, provides:

> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the for the following reasons:
>
> (1) mistake, inadvertence, surprise or excusable neglect;
>
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
>
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
>
> (4) the judgment is void;
>
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or

>vacated; or applying it prospectively is no longer equitable; or
>
>(6) any other reason that justifies relief.

Fed. R. Civ. P. 60(b).

38. "Motions under Rule 60(b) are addressed to the sound discretion of the ... court and are generally granted only upon a showing of exceptional circumstances." In re Waugh, 367 B.R. 361, 366 (Bankr. E.D.N.Y. 2007) (alteration in original) (citing Mendell v. Gollust, 909 F.2d 724, 731 (2d Cir.1990)).

39. The Committee can make no colorable argument that any of the grounds for relief under Fed. R. Civ. P. 60(b) apply, let alone that "exceptional circumstances" are present.

40. Consequently, the Motion should be denied.

B. **The Banks Should be Permitted to Credit Bid**

41. Section 363(k) of the Bankruptcy Code provides:

>At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. § 363(k).

42. The Committee asserts that the First Lien Lenders' liens against the collateral of BMH "*will be* avoided in an adversary proceeding that the Committee *intends to file* prior to the expiration of the Challenge Period." Motion ¶ 34 (emphasis added).

43. The Committee further argues that "the current status of the Bank Group's claims and liens are in serious doubt" but concedes that "these claims will not be determined by the Court prior to the current bid and auction process set forth in the Bid Procedures Order." Motion ¶ 35.

44. This concession entirely undermines the Motion. Because the Court will not determine the validity of the First Lien Lenders' liens prior to the completion of the Debtors' sale process, there is no basis to prohibit the First Lien Lenders from credit bidding.

45. The Committee nevertheless proposes to threaten the sale process without any justification. If the First Lien Lenders are permitted to credit bid (as this Court has already ordered), are the successful purchaser of all or a portion of the Debtors' assets and the Court later decides that their liens were invalid, the First Lien Lenders can simply be required to pay the estates in cash for the assets for which they have successfully credit bid. If, on the other hand, the First Lien Lenders are prohibited from credit bidding and the Court later determines that their liens were valid, the Debtors might suffer significant and irreversible harm by potentially not having obtained the highest and best offers for their assets.

46. Allowing the First Lien Lenders to credit bid because they can later be required to pay the estates in cash if their liens are avoided is a straightforward and fair approach that is supported by case law, including a case that the Committee cites: <u>Bank of Nova Scotia v. St. Croix Hotel Corp. (In re St. Croix Hotel Corp.)</u>, 44 B.R. 277 (Bankr. D.V.I. 1984).

47. In that case, it was unclear at the time of the Debtors' asset sale whether the bank had an "allowed claim" under 11 U.S.C. § 363(k).

48. The Court stated that the bank had "resources quickly available to meet any obligation involved herein." <u>Id.</u> at 279. Thus, rather than prohibit the bank from credit bidding, the Court allowed the bank "an offset on an intermediate basis, to become permanent, or to be negated as the case may be, upon the final determination of whether it is entitled to an 'allowed claim.'" <u>Id.</u>

49. Similarly, in this case, the First Lien Lenders are able to write a check to the Debtors' estates for any assets that they purchase by credit bid if it is later determined that they do not have a secured claim."

50. The Court reached a similar result in In re Miami General Hospital, 81 B.R. 682 (S.D. Fla. 1988), in which an unsuccessful bidder challenged the successful credit bid of a lender because the Bankruptcy Court had not determined the validity of the lien at the time of the sale. The District Court affirmed the Bankruptcy Court's decision to allow the lender to credit bid pursuant to a stipulation between the lender and the trustee, which preserved the trustee's right to object to the lender's lien.

51. In reaching its decision, the District Court stated that the debtor " was on the verge of closing down. The Bankruptcy Judge was under intense pressure to act expeditiously in an attempt to salvage the Hospital as a going concern." Id. at 688. The District Court also noted that allowing the lender to credit bid "escalated the bidding" and allowed the trustee to realize a higher sale price than he would otherwise have obtained. Id.

52. Here, too, the Debtors are not assured of surviving as going concerns beyond July 30, 2010, when their DIP financing will expire. Therefore, it is critical that the Debtors realize the highest and best offers for their assets before that time, and the First Lien Lenders' credit bid increases the Debtors' likelihood of doing so.

53. In addition, contrary to the Committee's contentions (Motion ¶ 36, n.13), the First Lien Lenders' ability to credit bid contributes to, rather than detracts from, the sale process, and the Committee has provided no evidence that the First Lien Lenders' intent to credit bid has chilled the bidding.

54. Because the Court will not determine the validity of the First Lien Lenders' liens until after the Debtors' assets have been sold, and because the First Lien Lenders

13

can pay cash for the assets if it is later determined that their liens are invalid, the Motion should be denied.

        **C.**    **The Committee Will Face Impediments to Succeeding on the Merits of Avoidance Actions**

55. While, as described above, the Court cannot determine the merits of any avoidance actions that that the Committee might bring before an adversary proceeding has been commenced, the Debtors foresee several impediments to the Committee's likelihood of success in any avoidance actions it might bring to challenge the First Lien Lenders' liens against the property of BMH.

56. First, under 11 U.S.C. § 548(a)(1)(B), the Committee will be required to show, among other things, that BMH was insolvent when it incurred obligations under the Debtors' pre-petition credit agreements, became insolvent as a result thereof or was left with "unreasonably small capital." 11 U.S.C. § 548(a)(1)(B)(ii).

57. "In determining whether a company was adequately capitalized, courts examine not what ultimately happened to the company, but whether the company's then-existing cash flow projections (i.e., projected working capital) were reasonable and prudent when made." Statutory Committee of Unsecured Creditors on behalf of Iridium Operating LLC v. Motorola, Inc. (In re Iridium Operating LLC), 373 B.R. 283, 345 (Bankr. S.D.N.Y. 2007). The value of a company's assets for purposes of analyzing allegedly fraudulent transfers "must be determined as of 'the time of the alleged transfer and not at what [assets] turned out to be worth at some time after the bankruptcy intervened.'" Id. (alteration in original) (citation omitted).

58. In support of its argument that BMH was insolvent or was rendered insolvent when it entered into the pre-petition credit agreements, the Committee relies on assertions by the Debtors and the First Lien Lenders that the value of the Debtors' assets is

14

significantly less than the amount of the Debtors' pre-petition obligations to its secured lenders. Motion ¶ 20.

59. In analyzing a fraudulent transfer claim, however, the Court must look to the value of BMH's assets when it entered into the pre-petition credit agreements, not post-petition. See Iridium Operating LLC, 373 B.R. at 345 (holding that creditors' committee failed to prove that debtor was insolvent or inadequately capitalized because cash flow projections were reasonable at the time they were made).

60. In September 2007, when BMH entered into the pre-petition credit agreements, its financial circumstances and prospects (and those of the newspaper industry generally) were far stronger than they are now. Any analysis of the company's solvency and the reasonableness of the amount of its capital will have to take this into account.

61. Second, the Committee's valuation of BMH's assets in 2007 does not take account of BMH's right of contribution against BPC in the event BMH was called on to pay on the guaranty. "In valuing the cost of [a debtor's] guaranty, the right of contribution from co-guarantors needs to be balanced against the amount of debt for which [the debtor] is liable." See Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 648 (3d Cir. 1991).

62. Consequently, in analyzing BMH's solvency and the adequacy of its capitalization, the Court will also have to take into account any rights of contribution that BMH acquired against its co-obligor, BPC.

WHEREFORE, the Debtors respectfully request that the Court deny the Motion, and grant such other or further relief as the Court deems just and proper.

Dated: New York, New York
July 14, 2010

                        K&L GATES LLP

                        By: */s/ Edward M. Fox*
                           Edward M. Fox
                           A Member of the Firm
                        Proposed Counsel for Debtors,
                        The Brown Publishing Company *et al.*
                        599 Lexington Avenue
                        New York, New York  10022
                        (212) 536-3900