UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
In re:

                                Chapter 11

THE BROWN PUBLISHING
COMPANY,
DAN'S PAPERS, INC.,
BROWN MEDIA HOLDINGS                      Case No. 10-73295
COMPANY,
BOULDER BUSINESS INFORMATION
INC.,
BROWN BUSINESS LEDGER, LLC,           (Jointly Administered)
BROWN PUBLISHING INC., LLC,
BUSINESS PUBLICATIONS, LLC,
THE DELAWARE GAZETTE
COMPANY,
SC BIZ NEWS, LLC,
TEXAS COMMUNITY NEWSPAPERS,
INC.,
TEXAS BUSINESS NEWS, LLC,
TROY DAILY NEWS, INC.,
UPSTATE BUSINESS NEWS, LLC,
UTAH BUSINESS PUBLISHERS, LLC,
ARG, LLC,
           Debtors.
------------------------------------------------------X

## MEMORANDUM DECISION

*Appearances:*

McBreen & Kopko
*Attorneys for Movant Roy E. Brown*
500 North Broadway, Suite 129
Jericho, New York 11753
By: Kenneth A. Reynolds, Esq.; Evan Gewirtz, Esq.


K&L Gates
*Attorneys for The Brown Publishing Company Liquidating trust*
599 Lexington Avenue
New York, NY 10022
By: Edward M. Fox, Esq.; Eric T. Moser, Esq.


Honorable Dorothy T. Eisenberg, U.S. Bankruptcy Judge

## **Introduction**

On June 16, 2011, pursuant to the plan of liquidation in this case, a liquidating trust was established in order to succeed to all assets and causes of action of the bankruptcy estates of the above-captioned debtors. The liquidating trust has commenced adversary proceedings against certain former officers, directors, shareholders, and affiliates of the debtors, by and through its special counsel, the law firm of K&L Gates ("KLG"). KLG had been counsel to the debtors-in-possession during the course of these Chapter 11 cases.

Roy E. Brown, former CEO, shareholder, and director of each of the debtors, is one of the primary defendants in the aforementioned adversary proceedings commenced by KLG. Mr. Brown has made various motions in this case, with the ultimate objectives being (1) to disqualify KLG as counsel to the liquidating trust, and (2) to force KLG to disgorge all legal fees it has been paid in this case. Mr. Brown asserts two basic grounds for disqualification and disgorgement: (1) various conflicting loyalties on the part of KLG, resulting from attorney-client relationships arising between KLG and insiders of the debtors, and the largest creditors in this case; and (2) failure of KLG to make adequate disclosure of all its connections to the creditors in this case, in seeking its retention as counsel to the debtors-in-possession. KLG and the liquidating trust have vigorously opposed Mr. Brown's motions.

For the reasons discussed below, Mr. Brown's various motions are GRANTED in part and DENIED in part.

## **Jurisdiction and Venue**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This matter is a core proceeding under 28 U.S.C. § 157. Venue is proper under 28 U.S.C. §§ 1408 and 1409.

**Background**

**Brown Publishing Company and Brown Media Holdings**

At the time of filing, Debtor Brown Publishing Company ("BPC"), founded in 1920, was a privately-held and controlled community news and information corporation, headquartered in Cincinnati, Ohio, although there were operations in at least 7 states, including New York.

Debtor Brown Media Holdings, LLC ("BMH") was formed in 2007 as a holding company. Those Debtors who are not subsidiaries of BPC are subsidiaries of BMH.

The Debtors consisted of 15 affiliated entities whose businesses revolved primarily around the publication of periodicals (such as newspapers, magazines, and trade publications) and other media. At the time of filing, the Debtors collectively published: fifteen (15) paid daily papers; thirty-two (32) paid weekly newspapers; eleven (11) paid business publications; forty-one (41) free newspapers, shoppers' and niche publications; and fifty-one (51) newspaper and niche websites.  Moreover, the Debtors operated substantial other businesses. Debtors BPC and BMH were the two "parent" companies in the group which controlled the operations of the other Debtors.

At the time of filing, the owners of BPC were: (a) Clarence J. "Clancy" Brown, III (brother of Roy Brown) (49.16%); (b) Clarence J. "Bud" Brown, Jr. (father of Roy and Clancy Brown) (35.62%); (c) AEG Equity, Ltd. (an entity of which Roy Brown was the sole shareholder) (14.47%); (d) Windjammer Capital (Debtors' mezzanine lender) (0.75%).

At the time of filing, the owners of BMH were: (a) Clancy Brown (30%) and (b) Roy Brown (70%).

BPC owned all or the vast majority of the stock in the following Debtors: (a) Troy Daily News, Inc.;  (b) The Delaware Gazette Company;  (c) SC Biz News, LLC; (d) ARG, LLC; (e) Utah Business Publishers, LLC; (f) Texas Business News, LLC; (g) Brown Business Ledger, LLC; and (h) Upstate Business News, LLC.

BMH owned all or the vast majority of stock in the following Debtors: (a) Dan's Papers Inc.; (b) Texas Community Newspapers, Inc.; (c) Brown Publishing Inc., LLC (not to be confused with BPC); (d) Boulder Business Information, Inc.; (e) Business Publications, LLC.

### The Debtors' Management

Since BPC and BMH were the parents of the other Debtors, control over these two companies brought with it control over the entirety of the Debtors' collective operations. Insofar as is pertinent to this Memorandum, the management of BPC and BMH was as follows:

(1). <u>Directors of BPC</u>: At the time of filing, the directors of BPC were: Clancy Brown (chairman); Bud Brown; Roy Brown; Joyce Brown (Bud Brown's wife and Roy Brown's mother); Joseph Szafraniec. Thomas Carlson became a director on the day the petitions were filed, since all the other directors resigned.

(2). <u>Directors of BMH</u>: At the time of filing, the directors of BMH were: Clancy Brown (chairman); Roy Brown; Joel Dempsey.

(3). <u>Officers of BPC and BMH</u>:

Roy Brown was the President, a director, and either a direct or indirect equity stakeholder of both BPC and BMH.

Joseph Ellingham was vice-president and CFO of BPC.

Joel Dempsey was both a director and the secretary of BMH. Moreover, Mr. Dempsey was assistant secretary, vice-president, and general counsel of BPC.  Roy Brown and Joel

Dempsey are long-time business associates: Both are principal stakeholders in several business ventures, some of which are related to the Debtors and others of which are not.[1]

Thomas Carlson, at the suggestion and recommendation of Mr. Fox, was initially appointed (on the date of the filing of the Debtors' petitions) as the only independent director of the Debtors with authority to oversee all aspects of the sale of the Debtors' assets in bankruptcy. He later became Trustee of the liquidating trust.

In 2002, BPC obtained mezzanine financing from a California private investment firm called Windjammer Capital ("Windjammer"). Problems emanating from BPC's dealings with Windjammer were what caused the Debtors ultimately to seek bankruptcy protection. The shareholders of BPC had executed certain agreements with Windjammer in connection with the financing:

(1). <u>The Warrant Agreement</u>: This agreement gave Windjammer the option to purchase $9 million worth of certain shares of BPC stock (the "Warrant Shares") for one cent per share, an infinitesimal fraction of what they were worth (the "Put Option"). If Windjammer exercised the Put Option, then it would acquire more than 30% of BPC's outstanding stock.

(2). <u>The Investors' Rights Agreement</u>: This agreement provided that, once Windjammer exercised its Put Option, it could then turn around and force BPC to buy back the Warrant Shares for $9 million. Moreover, if BPC could not pay the $9 million, then Windjammer could force BPC's shareholders to put BPC up for sale in order to raise the money.

A few years later, on September 19, 2007, the Debtors entered into two distinct financing arrangements, each with a different group of lenders. National City Bank, NA ("National City")

---

[1] Particularly, Roy Brown, Clancy Brown, and Joel Dempsey were for a time the sole equity stakeholders of both BMH and Sodalis, LLC ("Sodalis"). Sodalis both leased real estate to, and owned preferred stock in, BPC.

was the administrative and collateral agent for both lending groups, with authority to act on their behalf.

(1). <u>The First Lien Credit Agreement</u>: The Debtors entered into an Amended and Restated First Lien Credit Agreement (the "First Lien Credit Agreement") with a group of lenders referred to collectively herein as the "First Lien Lenders." Under the First Lien Credit Agreement, the First Lien Lenders agreed to provide up to $91 million in term financing and revolving credit in exchange for, among other things, a first-priority security interest in all of the Debtors' assets. PNC Bank ("PNC") succeeded National City as administrative and collateral agent for the First Lien Lenders.

(2). <u>The Second Lien Credit Agreement</u>: The Debtors entered into an Amended and Restated Second Lien Credit Agreement, which was between the Debtors and a group of lenders referred to collectively herein as the "Second Lien Lenders." The Second Lien Credit Agreement called for the Second Lien Lenders to provide the Debtors with a $33 million term loan facility in exchange for, among other things, a security interest in all of the Debtors' assets which was subordinate to that held by the First Lien Lenders. Wilmington Trust succeeded National City as administrative agent for the Second Lien Lenders.

## **<u>Windjammer Threatened to Exercise its Put Option</u>**

If Windjammer were to exercise its Put Option, the consequences were potentially disastrous for both the Debtors and the shareholders of BPC and BMH, for these reasons:

With respect to the Debtors, a change in BPC's equity ownership would result if Windjammer exercised its Put Option. This would constitute an "event of default" under the First and Second Lien Credit Agreements. This, in turn, would give the Lenders the right to accelerate their debt, which could result in the foreclosure of all of the Debtors' assets if the Debtors were

unable to pay the First Lienholder on demand. Moreover, Windjammer's ability to force the BPC shareholders to sell the company in order to raise the $9 million needed to buy back the warrant shares might have resulted in a piecemeal liquidation of BPC's assets that would destroy it.

With respect to the shareholders, Windjammer's ability to force them to sell BPC would effectively extinguish their control over the Debtors' collective business operations.

In November of 2008, Windjammer notified BPC's directors that it intended to exercise its Put Option. BPC did not have $9 million in liquid assets to redeem the Warrant Shares. Moreover, BPC's tax status with respect to its hard assets was such that, if it were to try to sell some assets in order to raise the $9 million, so much of the proceeds would be consumed by tax liability and payments to the secured Lenders that nothing would be left to pay Windjammer.

Faced with a problem of this magnitude, Roy Brown instructed Joel Dempsey to find a solution. While both men were concerned, to a degree, with the direct threat to the Debtors' well-being that Windjammer posed, they were primarily concerned with maintaining their own control over the Debtors.

Mr. Dempsey quickly realized that BPC and its principals would need additional, outside legal assistance in order to deal with the Windjammer problem. Thus, Mr. Dempsey recommended to the BPC principals that they reach out to his former colleague, Edward M. Fox of KLG. Messrs. Dempsey and Fox had worked together at a law firm between 1995-1997.

On December 11, 2008, Mr. Dempsey called Mr. Fox and briefly described the Windjammer problem. While in some sense Mr. Dempsey was reaching out to Mr. Fox on behalf of the Debtors in his capacity as general counsel for BPC, he was primarily concerned with helping principals of BPC maintain their control over the Debtors' businesses. Mr. Fox, for his part, maintains that he was being asked for advice from, and was giving advice to, Mr. Dempsey

solely in Mr. Dempsey's capacity as BPC's general counsel, and not on behalf of any insiders of BPC.

On December 12, 2008, Mr. Dempsey sent Mr. Fox a follow-up email to the December 11 phone call. Attached was a memorandum with "a little more detail" about the previous telephone discussion regarding Windjammer (the "Warrant Put Memo"). Even though the Warrant Put Memo did discuss the threats to the Debtors' interests that Windjammer posed, it seemed largely concerned with protecting the principals of BPC.

The Warrant Put Memo of December, 2008 set forth a version of a plan Mr. Dempsey proposed to deal with Windjammer. Specifically, Joel Dempsey, Roy Brown, and Joseph Ellingham (collectively the "Brown Insiders") would form a company referred to in the Warrant Put Memo as "New LLC," which would acquire all of the Debtors' assets in such a way that BPC's unfavorable tax status would not carry over to New LLC. Once this was done, New LLC, as a much more tax-efficient entity than BPC, could (by consent of the lenders) sell enough assets to raise $9 million and pay Windjammer. This transaction will be referred to herein as the "New LLC Transaction."

The specific mechanism that the Brown Insiders would rely upon in order to keep BPC's inefficiencies confined to BPC was a "friendly foreclosure" by the First Lien Lenders. Windjammer's exercise of its Put Option would constitute an "event of default" under the First Lien Credit Agreement, which would allow the First Lien Lenders to foreclose on the Debtors' assets. This would create large tax liabilities for BPC, but not New LLC, due to debt forgiveness resulting from the foreclosure. The First Lien Lenders would then transfer the assets to New LLC, which in turn would assume all of the First Lien Debt. Now that New LLC had the

Debtors' assets free of BPC's tax problems, with the lenders' consent it could sell enough assets to pay Windjammer, while retaining enough assets to carry on with the Debtors' core businesses.

Nevertheless, as the Warrant Put Memo makes clear, Mr. Dempsey realized that the New LLC Transaction posed thorny problems for the Brown Insiders. Specifically, since the Brown Insiders were principals of both BPC and New LLC, there were issues of conflicting interests. This gave rise to a risk that the New LLC Transaction might be disregarded by the IRS or the courts as a sham, and that the Brown Insiders might be personally liable for BPC's tax and other obligations under doctrines of corporate veil-piercing and successor liability. Mr. Dempsey, on behalf of the Brown Insiders, was clearly seeking advice from Mr. Fox to address these concerns on behalf of the Brown Insiders in their individual capacities.

In follow-up conversations between Mr. Fox, Mr. Dempsey, and possibly Roy Brown regarding the Warrant Put Memo, Mr. Fox admittedly provided some advice with respect to the New LLC Transaction. The parties dispute both the precise subject matter of the follow-up conversations[2] (particularly whether and to what extent the BPC Insiders' interests were emphasized as opposed to the Debtors' interests). Mr. Dempsey testified that he had a laundry list of questions for Mr. Fox that bore both on the financial health of the Debtors and the interests of the BPC shareholders. Mr. Dempsey also testified that Mr. Fox advised against pursuing the New LLC Transaction outside bankruptcy, and he advised that "all of these questions," including the "successor liability problems," could be answered in bankruptcy. Nevertheless, at this point,

---

[2] Roy Brown testified that Mr. Fox advised that the best way for the insiders to accomplish their goals of retaining control and getting rid of Windjammer was a quick sale of the Debtors' assets to New LLC in bankruptcy, under 11 U.S.C. § 363. Mr. Fox testified that the primary subject matter of the discussions was the extent to which the New LLC transaction might saddle the Debtors with onerous tax liabilities; Mr. Fox says he dismissed the New LLC Transaction as a "crazy tax avoidance scheme" which neither the Lenders nor the IRS would support. Mr. Fox also states that, to the extent the question of whether and under what conditions the insiders could purchase the Debtors' assets was discussed, he advised that, in bankruptcy, any transaction involving the insiders would be heavily scrutinized by the Bankruptcy Court, and that any bid would have to be subject to higher and better offers. December Transcript, 37:19-44:24; November 26 Morning Transcript, 202:13-203:1-25.

the Brown Insiders were not interested in a bankruptcy filing for the Debtors, and they made it clear that they wanted to accomplish the New LLC Transaction in a non-bankruptcy forum.

After the phone call of December 11, 2008, Mr. Fox testified that he followed KLG's standard procedures for opening up a new client matter for BPC. Part of this process was running a "conflicts check" on BPC. The conflicts check brought up Roy Brown, other members of the Brown family, and certain entities owned by the Browns as potential adverse parties to BPC.

On or around December 29, 2008, Mr. Fox testified that he sent to Mr. Dempsey an engagement letter, which was dated December 24, 2008 (the "First Engagement Letter"). The First Engagement Letter was addressed to Mr. Dempsey as Vice President and General Counsel of BPC, and included a signature line for Mr. Dempsey to sign in that capacity. Roy Brown signed the First Engagement Letter on behalf of the Debtors and returned it to Mr. Fox in August of 2009. The First Engagement Letter also requested a $10,000 fee, which the Debtors paid.

The First Engagement Letter provides that KLG understood that it was

> being engaged to act as counsel solely for Brown Publishing Company and not for any affiliated entity (including parents and subsidiaries), shareholder, director, officer or employee of Brown Publishing Company not specifically identified herein.

Between January and May or June of 2009, there was very little contact between the Debtors and KLG. It was during this time that the Brown Insiders tried, unsuccessfully, to effectuate a transaction outside bankruptcy—perhaps contrary to Mr. Fox's advice that it ought to be done, if anywhere, in bankruptcy, so as to avoid many of the aforementioned tax and successor-liability problems. Around January of 2009, Joel Dempsey and Joe Ellingham formed New LLC, as contemplated in the Warrant Put Memo, only under a different name: Business Publications, LLC ("Business Publications"), which is one of the Debtors in this case. This was

9

done in a bid to effectuate the New LLC Transaction as proposed in the Warrant Put Memo. This attempt failed and was not further pursued.

Prior to the bankruptcy filings, on June 5, 2009, Roy Brown and Joel Dempsey met with Mr. Fox and Eric Moser, also an insolvency partner at KLG, in KLG's Manhattan offices. The Debtors were in default under the First and Second Lien Credit Agreements, but standstill agreements were in place.

Roy Brown testified that the dominant subject matter for discussion at the meeting was how BPC's shareholders might acquire the Debtors' assets, free and clear of liens, through a quick bankruptcy sale to a new company, under 11 U.S.C. § 363, and thus maintain their control over the Debtors' businesses; comparatively little was discussed otherwise with respect to the Debtors' affairs. Roy Brown also stated that the parties discussed the matter of persuading the First Lien Lenders to finance the transaction.  He further stated that, after this meeting, based on KLG's advice, he felt confident that a bankruptcy filing, followed by a quick § 363 sale, would be the best way for the BPC shareholders to maintain control while otherwise dealing with the Windjammer problem.

By contrast, Messrs. Fox and Moser testified that this was just a typical, pre-bankruptcy meeting with the principals of a corporate client. They also testified that, insofar as a purchase by the BPC Insiders was discussed, they indicated that this was possible, but the insiders' bids would be subject to better bids, and an independent director would need to be appointed to oversee the sale process so as to avoid the taint of a conflict of interest.

One clear result of this meeting was that Roy Brown and Joel Dempsey were now contemplating a bankruptcy filing for the Debtors, in which they planned to effectuate something like the New LLC Transaction that they failed to accomplish outside of bankruptcy. Moreover,

they clearly wanted KLG to represent the Debtors in Bankruptcy Court. To that end, Mr. Fox

sent Mr. Dempsey a retainer agreement, serving as a rider to the First Engagement Letter. The

retainer agreement provided, in essence, that KLG would require a $100,000 retainer while

representing the Debtors in bankruptcy. Both the First Engagement Letter and the Retainer

Agreement were returned to KLG, signed by Roy Brown as President and CEO of BPC/BMH, in

August of 2009.

On August 20, 2009, Mr. Fox sent Mr. Dempsey a letter asking for the Debtors to waive

certain potential conflicts of interest on the part of KLG (the "Conflict Waiver Letter"). The

Conflict Waiver Letter stated, in pertinent part:

> As you know, the Firm [KLG] currently represents each of
> the First Lien Lenders and [Wilmington Trust] in connection with
> various lending and other matters (the "Bank Matters").
> Accordingly, if the Firm were to represent Brown in the Brown
> Matter [i.e. the Debtors' bankruptcies], **the Firm would have
> ongoing duties of loyalty to both Brown with respect to the
> Brown Matter and the Banks with respect to the Bank
> Matters…. Because the Brown Matter and the Bank Matters
> are not related, we believe that we would be able to provide
> appropriate representation of both Brown in the Brown
> Matter and the Banks in the Bank Matters and that our
> representation of each client will not be materially limited by
> our responsibilities to the other. Moreover, except for [Mr.
> Fox] and Eric Moser, who represent certain of the Banks in
> certain corporate trust matters**, the Firm lawyers working for the
> Banks in the Bank Matters will not be involved in the
> representation of Brown in the Brown Matter.

(Emphasis added).

As of August 2009, KLG was aware of a possible conflict on behalf of the Debtors and

their lien creditors. Particularly, at the time these bankruptcy cases were filed, Messrs. Fox and

Moser represented PNC in its capacity as indenture trustee for certain bondholders in the highly-

publicized *Enron* bankruptcy case. This representation lasted for much of the duration of these

bankruptcy cases. Moreover, Messrs. Fox and/or Moser represented Wilmington Trust, in its capacity as indenture trustee, in connection with the *Delphi* bankruptcy case. Messrs. Fox and Moser were also the primary attorneys for the Debtors during the course of that case. Roy Brown countersigned the Conflict Waiver Letter on behalf of the Debtors and returned it to KLG, thus apparently manifesting the Debtors' consent to the concurrent representations.

After the meeting of June 5, 2009, the Brown Insiders began seeking financing for their purchase of the Debtors' assets in bankruptcy. They sought financing from both the First Lien Lenders and other sources. Mr. Fox clearly assisted the Brown Insiders in their negotiations with the First Lien Lenders, even though he was formally representing only the Debtors.

Roy Brown testified that he informed Mr. Fox that he wanted to propose a transaction to the First Lien Lenders whereby they would finance a purchase, by the BPC Insiders, of the Debtors' assets in bankruptcy under 11 U.S.C. § 363, with a price tag large enough to make the First Lien Lenders whole. At this point, it was obvious to all concerned that there was not enough equity in the Debtors' assets to support the liens held by the Second Lien Lenders to any extent, so only the First Lien Lenders were really "secured." However, Mr. Fox advised that the First Lien Lenders should receive less than full payment, so as to avoid a situation where the Bankruptcy Court might disapprove the transaction as a *sub rosa* plan.

In light of this, a series of email communications and document exchanges ensued between Roy Brown, Joel Dempsey, and Mr. Fox concerning the BPC Insiders' efforts to persuade the First Lien Lenders to fund their bankruptcy purchase of the Debtors' assets.

On August 22, 2009, Joel Dempsey emailed Mr. Fox a memo, written by Roy Brown, which was meant to go to Mr. Gary Best of PNC (the "Draft Proposal Memo"). The Draft Proposal Memo clearly was not written on behalf of the Debtors, but on behalf of Roy Brown

and "certain managers" of the Debtors, the Brown Insiders. Its dominant thrust was to convince the First Lien Lenders to support a transaction which was somewhat similar to the New LLC Transaction, only to be done in the bankruptcy context.

The email sent in early September, 2009 asked Mr. Fox to review the Draft Proposal Memo and see if there were any "glaring problems." The email also remarked that the debt owing to the First Lien Lenders was about $69 million, and asked whether a price of $60 million was "enough of an impairment." Mr. Fox replied by email stating, "we'll take a look and get back to you."

The Draft Proposal Memo contemplated that the "managers" would put the Debtors in bankruptcy under Chapter 11 of the U.S. Bankruptcy Code, whereupon the Debtors would immediately file a motion under 11 U.S.C. § 363 to sell their assets in an open bidding process. The First Lien Lenders would finance a stalking-horse, or preliminary, bid by "Newco," a new company formed by the "managers," of $60 million.

On September 9, 2009, Mr. Fox sent Mr. Dempsey an email containing a black-lined version of the Draft Responsive Memo, highlighting where Mr. Fox and/or someone else at KLG had made extensive edits (the "Edited Responsive Memo").

By this time, the Revised Proposal Memo had already been sent to Mr. Best at PNC. The most significant change in the Revised Proposal Memo was that it called for a purchase price that ranged between $50-60 million, whereas the Draft Proposal Memo from Mr. Dempsey had called for a flat purchase price of $60 million.

PNC had expressed reservations about whether a quick sale of the Debtors' assets under 11 U.S.C. § 363 in Bankruptcy Court was a good solution to the Debtors' various problems. Thus, Roy Brown and Joel Dempsey drafted a memorandum to respond to PNC's concerns (the

"Draft Responsive Memo"). The Draft Responsive Memo essentially explained the various options for dealing with BPC's debt, both bankruptcy-related and non-bankruptcy related. It also set forth the reasons why Mr. Brown believed that a quick sale in bankruptcy under 11 U.S.C. § 363 to Newco was the best option. Mr. Brown clearly did not write the Draft Responsive Memo on behalf of the Debtors as their CEO; rather, he wrote it on behalf of himself and other "managers" of BPC who wanted to buy the Debtors' assets.

On October 30, 2009, Messrs. Brown, Fox, and Dempsey met once again at KLG's Manhattan offices.  The point of this meeting was for Roy Brown and the other BPC insiders to apprise KLG of the insiders' efforts to obtain financing to buy the Debtors' assets. Mr. Fox unequivocally maintains that he never advised the insiders about their purchase of the assets, but that Joel Dempsey kept him generally apprised of these matters.

Around January of 2010, the Brown Insiders were working primarily with three (3) prospective financiers: (1) Goldman Sachs; (2) Guggenheim Partners ("Guggenheim"); (3) Prospect Capital. The Brown Insiders eventually reached an agreement with Guggenheim.

Nevertheless, on January 21, 2010, a representative of Goldman Sachs sent Mr. Dempsey an email, asking to schedule a phone conference for the next day to discuss the possibility that Goldman Sachs might provide financing for the Brown Insiders. According to the email, proposed agenda items for the phone conference included:

> –Existing Lenders: what is status with both first lien and second lien lenders; what is basis for belief that the existing lenders would accept $20mm, and would not attempt to credit bid higher themselves
> –Bankruptcy: discuss the expectation for the filing and 363 process (pre-arranged/pre-pak?); what happens to the tax bill from COD; how do you get comfortable that others will not bid; stock vs. asset; tax basis of Newco

On January 22, 2010, Messrs. Dempsey and Fox participated in a phone conference with representatives from Goldman Sachs. Mr. Fox insists that he attended this meeting at Mr. Dempsey's request, solely in his capacity as counsel for the Debtors. However, Roy Brown testified that Mr. Fox touted the benefits of the § 363 sale to Goldman. Specifically, he says that Mr. Fox explained, in essence, that a § 363 sale would proceed so quickly that other potential bidders would not have time to do their due diligence, which presumably decreases the likelihood of competing bids and correspondingly increases the chances that the BPC Insiders, through Newco, would walk away with the Debtors' assets.  The court notes that the insiders did not have their own counsel at this time for this discussion.

In March of 2010, very shortly before the filing of the instant bankruptcy petitions, the Brown Insiders formed Newco, as contemplated in the Draft and Revised Proposal Memos, only under a different name: Brown Media Corporation ("Brown Media"). The Brown Insiders were the only equity stakeholders in Brown Media.

On April 7, 2010, approximately three weeks prior to the petition dates, on Mr. Fox's suggestion and recommendation, Brown Media retained Mr. Fox's friend, Mr. Richard Levy,[3] to represent it in the course of negotiating an asset-purchase agreement (the "Brown Media APA") with the Debtors, under which Brown Media would serve as the stalking-horse bidder in the contemplated auction sale of the Debtors' assets under 11 U.S.C. § 363. Mr. Fox had become acquainted with Mr. Levy when they worked together at a prior law firm.  Mr. Fox and KLG represented the Debtors in these stalking-horse negotiations, which lasted for several weeks, resulting in execution of the Brown Media APA sometime after the instant bankruptcy petitions were filed. Mr. Levy had absolutely no involvement in any of the events on behalf of the brown insiders as discussed in this Memorandum that pre-date his retention.

---

[3] Exhibit 117.

KLG had previously informed the Brown Insiders that, if they wanted to participate in any auction sale of the Debtors' assets in bankruptcy, then the Debtors would need to appoint an independent director to oversee all aspects of the sale, so as to remove any taint of conflicting interests from the transaction. Initially, the principals of the Debtors wanted to hire Mr. Joseph Szfraniec, a director of BPC, for the job, and they offered Mr. Szfraniec the position on behalf of the Debtors. However, Mr. Szfraniec declined the position.

Afterwards, Mr. Fox suggested and recommended his former colleague, Thomas Carlson, CPA, CIRA, for the position. Mr. Carlson is not an attorney, but he has significant experience in restructuring, reorganization, and auditing practice. Nevertheless, Mr. Carlson had no experience in the publishing business. Mr. Fox first became acquainted with Mr. Carlson in connection with the *Delphi* bankruptcy case. In that case, Mr. Fox represented Wilmington Trust, and Mr. Carlson was financial advisor to the creditors' committee. The Debtors' respective managing boards approved Mr. Carlson on April 30, 2010, the date the Debtors filed their petitions.

Between April 30, 2010 and May 1, 2010, each of the Debtors filed "bare bones" petitions for relief under Chapter 11 of the Bankruptcy Code in this Court. The cases were ultimately consolidated for procedural purposes only. The Debtors' initial petitions were missing many of the schedules and other documents required under 11 U.S.C. § 521(a). The Debtors sought and obtained an extension of time to file the schedules, and eventually filed them on May 29, 2010. Even though KLG was apparently not ready to file the Debtors' schedules and related statements with their petitions, on May 4, 2010 (three to four days after the instant bankruptcy

filings), KLG moved to sell the Debtors' assets under 11 U.S.C. § 363, on expedited notice, with Brown Media as the proposed introductory bidder.[4]

Pursuant to 11 U.S.C. §§ 327 and 1107, the Debtors each filed an application for authority to retain KLG as counsel for their respective bankruptcy estates. Pursuant to Federal Rule of Bankruptcy Procedure 2014, KLG was required to submit an affidavit setting forth all connections between KLG and any parties in interest to the bankruptcy cases. Mr. Fox, acting for KLG, filed such an affidavit (the "Rule 2014 Affidavit"). The Rule 2014 Affidavit stated that the Debtors had 1,250 creditors, about 483 of which were being, or had been, represented by KLG in unrelated matters. An annexed exhibit alphabetically lists all 483 creditors. Among the creditors listed are PNC and Wilmington Trust. The list specifies that PNC and Wilmington Trust are the agents for the First and Second Lien Lenders, respectively. All of the original First Lien Lenders are also listed in alphabetical order, including Huntington Bank.[5] However, nothing in the Rule 2014 Affidavit sets forth how Messrs. Fox and/or Moser had roles in KLG's representations of PNC either in the *Enron* case and Wilmington Trust in the *Delphi* case, or any other connection of it to any of the other 483 creditors. There is no further information provided as to any connections with any attorney or party that might be a party-in-interest in this case. There is no mention of Mr. Fox's prior connection to Mr. Levy, Mr. Carlson, or the Debtors' principals. Without any information as to any relationships of Mr. Fox or KLG, and no one objecting to its

---

[4] The speed with which KLG filed this motion was apparently due to a condition of certain post-petition financing that PNC and other creditors had agreed to provide; the financing was conditioned on filing the motion by May 4, 2010.

[5] Huntington Bank had a security interest in certain property owned by an entity called CRJ Investments. CRJ leased the property to the Debtors. Clancy Brown, Roy Brown, and Joel Dempsey are the principals of CRJ. After these bankruptcy petitions were filed, but before the auction sale, Huntington started proceedings to foreclose against the property, which violated the automatic stay imposed pursuant to 11 U.S.C. § 362(a), because it stood to terminate the Debtors' leasehold interest in the property. KLG brought a motion to enjoin the foreclosure, but not until after the auction sale. Roy Brown maintains that KLG's delay in moving against Huntington evidences conflicting loyalty on the part of KLG. Mr. Carlson, though, testified that the decision to wait until after the auction sale was his decision, made after consultation with KLG as DIP counsel. Mr. Carlson thought litigation over the stay violation would discourage bidding more than would the mere pendency of the Huntington foreclosure action.

general statement that it had no conflicts or connection to any person or party in interest, this

Court approved the Debtors' retention of KLG by Order dated June 28, 2010. Mr. Fox and Mr.

Moser were lead counsel and primary billing attorneys for the Debtors. [6]

The § 363 sale of the Debtors' assets finally took place on July 19, 2010, after

considerable contentious litigation. The sale lasted for roughly 23 hours, with multiple rounds of

vigorous bidding, primarily between PNC and Brown Media. Mr. Levy appeared at the auction

sale as counsel for Brown Media, and Mr. Fox appeared as counsel for the Debtors. The assets

were sold in 3 different lots. Brown Media was declared the successful bidder for most of the

Debtors' assets. Nevertheless, Guggenheim withdrew its financing commitment before Brown

Media could close. Thus, PNC, as the next-highest bidder, became the successful bidder. The

total purchase price tendered for the Debtors' assets, including cash and debt forgiveness, was

about $27,090,000.

On June 16, 2011, the Court confirmed the Debtors' third amended joint plan of

reorganization (the "Plan"). The Plan established the Brown Publishing Company Liquidating

Trust to succeed to the assets of the Debtors' estates, including all causes of action. Mr. Carlson

was appointed Liquidating trustee. The Plan provides that the liquidating trust may retain KLG

on a contingent fee basis to pursue affirmative recoveries, which it did.

On March 29, 2011, shortly before the Plan was confirmed, Messrs. Carlson, Brown, and

Dempsey, together with Mr. Brown's counsel, met at KLG's offices in Manhattan. At this

meeting, Mr. Brown learned that he would likely be sued on behalf of the liquidating trust, yet he

did not raise any opposition to confirmation, or to the request for payment of fees by KLG.

Almost a year later, on March 15, 2012, Mr. Brown, after learning that he and certain of

his family members were going to be sued, filed a *pro se* motion to disqualify KLG from

---

[6] Messrs. Fox and Moser have since left KLG for other law firms.

representing the liquidating trust in connection with the litigation against him, referred to herein as the "Brown Adversary Proceeding" (the "First Disqualification Motion"). KLG, on behalf of the liquidating trust, filed a preliminary objection to this motion on March 23, 2012. The basis for the First Disqualification Motion was that a conflict of interest arose, due to the fact that, pre-petition, KLG, rather than acting exclusively for the benefit of its "official" clients, the Debtors, was really acting for the benefit of Roy Brown and other Brown Insiders, to help them to obtain the Debtors' assets in bankruptcy.

On March 30, 2012, Roy Brown filed another *pro se* motion seeking to disqualify KLG (the "Second Disqualification Motion"). The Second Disqualification Motion seeks to disqualify KLG from representing the liquidating trust in connection with its opposition to the First Disqualification Motion. On May 6, 2012, KLG, on behalf of the liquidating trust, filed its objection to both the First and Second Disqualification Motions under seal.

On September 17, 2012, Roy Brown, this time with the aid of counsel, filed a motion to amend the First Disqualification Motion, citing "newly discovered facts" concerning KLG's representation of PNC and Wilmington Trust, and KLG's failure fully to disclose the nature of the representation in its Rule 2014 Affidavit (the "Motion to Amend"). The Motion to Amend also specifically asked that this Court order KLG to disgorge any legal fees it had been paid in connection with the instant bankruptcy cases.

On October 1, November 26, and December 3, 2012, this Court conducted an evidentiary hearing in this matter. On January 11, 2013, Mr. Brown submitted his final post-trial brief. On January 13, 2013, KLG did the same. Final oral arguments were held at another hearing on January 17, 2013, where the Court indicated that Roy Brown's various motions and all documents submitted would be taken under advisement, with a written decision to follow. This

Memorandum disposes of the First Disqualification Motion, the Second Disqualification Motion, and the Motion to Amend.

The Motion to Amend is granted, but there is no need for additional pleadings, as all possible documents have been filed. The First Disqualification Motion is granted, but its final resolution as to sanctions, if any, must await a separate hearing.

The Second Disqualification Motion is based on New York Rule of Professional Conduct ("NY RPC") 3.7 (a), which provides that a lawyer may not act as an advocate in a matter where the lawyer is also likely to be a witness on a significant fact issue, unless an exception applies. Roy Brown points out that Messrs. Fox and Moser are the primary attorneys representing the liquidating trust in its opposition; they were also central figures in the events that precipitated the motions. This means that they were necessarily material fact witnesses in these proceedings and, therefore, KLG must not be permitted to represent the liquidating trust in connection with the instant motions.

Nevertheless, NY RPC 3.7(a) sets forth various exceptions to the general rule, two of which are pertinent here:

> (2) the testimony relates solely to the nature and value of legal services rendered in the matter;
> (5) the testimony is authorized by the tribunal [before which the matter is being heard].

NY RPC 3.7(a)(2), (5). Both exceptions apply here.

The testimony here relates "solely to the nature and value of legal services rendered" in these cases. NY RPC 3.7(a)(2) permits the lawyer to act as both witness and advocate where "the testimony relates solely to the nature and value of legal services rendered in the matter." Here, the allegations at the heart of the Motions are inextricably tied to the "nature and value of legal

services" rendered by KLG. Therefore, it seems appropriate to permit Messrs. Fox and Moser to act as both advocates and witnesses in this matter.

The Court finds good cause here to permit Messrs. Fox and Moser to testify while fulfilling the role of advocate on behalf of the Liquidating trust. In this case, the Court can distinguish properly between a lawyer giving fact testimony and a lawyer advocating for his or her client, and hence is able to afford each type of communication the appropriate weight. Therefore, the problem that NY RPC 3.7(a) was apparently meant to address simply is not present here. The Court finds cause to permit Messrs. Fox and Moser to fulfill the dual roles of witnesses and advocates in connection with the instant proceedings. Therefore, the Second Disqualification Motion is denied.

The Motion to Amend does more than merely ask for permission to amend the First Disqualification Motion; it sets forth substantial arguments with respect to why KLG's concurrent representations of the Debtors and a large number of creditors give rise to disabling conflicts of interest. Moreover, it sets forth why Roy Brown believes that KLG did not adequately disclose its representation of PNC and Wilmington Trust in its Rule 2014 Affidavit.

These issues were fully developed in the trial testimony, document production, and in subsequent briefing and oral argument. Thus, it would be superfluous at this point for the Court merely to grant leave to amend, and thereby set in motion a needless round of briefing, hearings, and argumentation in these already drawn-out proceedings. Therefore, the Motion to Amend is granted insofar as it seeks leave to amend the First Disqualification Motion, but there is no need for the filing of additional papers.

The First Disqualification Motion, as supplemented by the Motion to Amend, cannot be fully disposed of now. While the Court finds both that KLG was conflicted throughout its

representation of the Debtors in this case, and that KLG made inadequate disclosure in its Rule 2014 Affidavit, the Court is not now in a position to decide what sanctions, if any, should be imposed as a result. Therefore, the matter of sanctions will await a separate hearing at a later date.

In regard to the allegation of attorney client relationship, the Court finds the pre-petition interactions between KLG, Roy Brown, and Joel Dempsey did give rise to an attorney-client relationship.

The Restatement (Third) of the Law Governing Lawyers (the "Restatement") sets forth a helpful synthesis of the principles that govern whether and when an attorney-client relationship is created. According to Restatement § 14(1), an attorney client relationship arises when:

> (1) a person manifests to a lawyer the person's intent that the lawyer provide legal services for the person; and either
> (a) the lawyer manifests to the person consent to do so; or
> (b) the lawyer fails to manifest lack of consent to do so, and the lawyer knows or reasonably should know that the person reasonably relies on the lawyer to provide the services.

Courts and litigants have often looked to the Restatement for the standard governing when a lawyer-client relationship exists. *See, e.g., Dixon Ticonderoga Co. v. Estate of O'Connor*, 248 F.3d 151, 155-156 (3d. Cir. 2001)(relying on Restatement § 14 where parties agreed that standard applied); *Hopper v. Frank*, 16 F.3d 92, 95 (5th Cir. 1994)(relying on the original Restatement of the Law: The Law Governing Lawyers to determine existence of attorney-client relationship); *U.S. v. Pizzonia*, 415 F.Supp.2d 168, 178-179 (E.D.N.Y. 2006)(relying on Restatement § 14).

Moreover, there does not need to be any formal contractual arrangement in place in order for there to be an attorney-client relationship. *See* Restatement §14, *comment c.*

Therefore, even though KLG never had a formal arrangement in place to establish such a relationship with Roy Brown or any other BPC insiders, and even though the First Engagement Letter says that KLG was not signing on to represent insiders, these facts do not foreclose the existence of such a relationship if one did in fact exist in substance.

The papers submitted by both parties in connection with the instant motions attach voluminous emails and other correspondence referring to many discrete communications, principally between Messrs. Fox and Dempsey. Moreover, in situations where communication obviously occurred but was not documented, the parties invariably hotly dispute the issue of precisely what was discussed. Nevertheless, the Court need not make reference to each discrete communication, nor does it need to resolve most of the disputes between the parties with respect to what precisely was discussed at any given meeting. Indeed, the Court may find that an attorney-client relation did arise as a result of Mr. Fox's pre-petition interactions with Mr. Dempsey and others, using primarily those factual contentions as to which the parties essentially agree.

Even if Mr. Fox is entirely truthful and accurate in stating that he and Joel Dempsey never actually directly discussed those aspects of the Warrant Put Memo that related solely to the insiders' interests, the fact remains that Mr. Dempsey asked him for advice on those points. Indeed, Mr. Dempsey unequivocally testified that he reached out to Mr. Fox not only on behalf of the Debtors, but also on behalf of BPC's shareholders, which included Roy Brown. Further, the Warrant Put Memo clearly raises issues that pertain almost exclusively to the interests of BPC insiders. Indeed, the issue of whether the insiders could maintain control by virtue of the New LLC Transaction was a primary theme of the Warrant Put Memo.

Therefore, under Restatement § 14(1), Mr. Dempsey, on behalf of Roy Brown and others, manifested to Mr. Fox a desire that Mr. Fox provide them with legal services, *i.e.* advice, with respect to their individual interests. Moreover, while Mr. Fox may not have overtly manifested consent to provide such advice, and may indeed never have actually provided it, he did "fail to manifest lack of consent to do so," in that the record is devoid of any instance where Mr. Fox refused to provide the advice sought with respect to the insiders' interests.

Indeed, a lawyer "may… indicate consent [to provide legal services] by action, for example by performing services requested…." Restatement § 14, *comment e.* Mr. Fox admits that he did perform services requested in that he did offer some input on the Warrant Put Memo, which again inextricably blended considerations of both the Debtors' and the insiders' interests. Moreover, in light of the foregoing, Mr. Fox clearly had reason to suspect that Mr. Dempsey, on behalf of Roy Brown and the other insiders, was relying on Ed Fox to provide advice with respect to the insiders' interests in addition to the Debtors'.

The Draft Proposal Memo, the Revised Proposal Memo, and Draft Responsive Memo patently were not written on behalf of the Debtors, but plainly were drafted by and on behalf of Roy Brown and other insiders of BPC, and they clearly addressed the interests of Roy Brown and "certain managers" of BPC. Mr. Dempsey clearly asked Mr. Fox for input with respect to these memoranda, and Mr. Fox gave it. In commenting on the Revised Proposal Memo, Mr. Fox opined that the range of sale prices from $50-60 million was "better" than the Draft Proposal Memo's fixed offer of $60 million. Even though KLG contends that Mr. Fox offered this input in order to look out for the Debtors' interests (since asset-valuation has serious implications in any complex bankruptcy case), the trial in this matter was not the time for Mr. Fox to make this clear; he should have made this clear in his initial replies to Mr. Dempsey. *See* NY RPC 1.13 (requiring

that, where the lawyer for an organization communicates with constituents of the organization under circumstances where the constituents' interests might differ from the organization's, the lawyer must make clear that s/he represents the organization, not the constituents).

Moreover, when Mr. Dempsey sent the Draft Responsive Memo to Mr. Fox, Mr. Fox replied with an email stating simply that KLG would "take a look and get back to you." Sometime later, Mr. Fox sent the Edited Responsive Memo, the black-lined version of which contains numerous, substantial revisions to the Draft Responsive Memo. Again, KLG contends that these edits were made so as to look out for the Debtors' interests, but even if this were true, the right forum for KLG to make this clear was not at trial, or in its present briefs, but rather in the very email containing the Edited Responsive Memo.

Thus, we have a situation where Messrs. Brown and Dempsey "manifested their desire" that KLG give them legal advice with respect to their own individual interests, and reached out to Mr. Fox for legal advice on several memoranda which patently pertained to their interests. Mr. Fox, rather than refusing to provide such advice, or at least making clear that any advice he did provide was only on behalf of the Debtors, instead simply offered input which Messrs. Brown and Dempsey could easily have interpreted as being for their own personal benefit.  Therefore, Messrs. Brown and Dempsey sought legal advice from Mr. Fox; Mr. Fox failed to manifest lack of consent; and the circumstances clearly indicated that Messrs. Brown and Dempsey had reason to rely on Mr. Fox's providing the advice.

The Court is aware that attorneys retained to represent a corporate debtor are often asked to provide some guidance or legal advice to its principals on their personal behalf. At times, there is a fine line between debtor's counsel's capacity to differentiate between adequate information on behalf of the debtor and legal advice strictly for the benefit of the individuals.  The insiders

need to be informed that they need to retain separate counsel to pursue their individual needs. There is no evidence in this record that this was done.   Therefore, the Court finds that a pre-petition attorney-client relationship arose between KLG and the BPC Insiders.

More disturbing to this court is the fact that Mr. Fox's Rule 2014 Statement on behalf of KLG fails to abide by the spirit and intent of Rule 2014.

Rule 2014 of the Federal Rules of Bankruptcy Procedure dictates the information that must be contained in an application for employment, including, "all of the person's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the United States Trustee, or any person employed in the Office of the United States Trustee" and further provides that a verified statement made by prospective counsel as to such connections must be included with the application.

Courts have emphasized the importance of making thorough disclosures of any connections as required by Rule 2014 when seeking to employ counsel pursuant to Section 327. *In re Leslie Fay*, 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994).   *In re Biddle*, 2012 WL 6093926 at *3-5 (Bankr. D.S.C. Dec. 6, 2012).  This obligation to make disclosure of any connection continues beyond the court's approval of an employment application.  *Forizs & Dogali, P.A. v. Siegel*, 2012 WL 4356266 at *3 (M.D. Fla. Sept. 24, 2012).  The obligation to disclose is a continuing one.  *Id*.

KLG filed a general statement indicating that they may or may not have been retained by certain creditors of the debtor and, to the best of their knowledge, they did not know of any conflict.  This statement did not point out which of the 483 creditors, attorneys or parties in this case it had had specific dealings with or which ones the firm had a continued legal relationship with at or about the time of the filing of this debtor's case.  At a minimum, it is incomplete.  It

did not set forth any circumstances that might have any adverse interest in connection with the present representation of the Debtor.   KLG's failure to point out its prior relationship to significant creditors, and to its prior relation with the insiders, belies the spirit of Rule 2014.

Pursuant to Rule 2014, any application for authorization for a debtor-in-possession to employ estate counsel must "be accompanied by a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors [and] any other party in interest …"  Rule 2014 requires the prospective attorney for the debtor-in-possession to disclose "[a]ll facts that may have any bearing on the disinterestedness of [attorney]," even if those facts would not necessarily create a disabling conflict of interest.  This is because it is for the Court, not the attorney, to decide whether a disabling conflict is present.  The Court needs access to all salient facts in order to make that determination.  *See In re Leslie Fay*, 175 B.R. at 533.  Moreover, "[s]o important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification." *Id.*

Therefore, even assuming, as KLG vigorously argues, that it's concurrent or prior representation of 483 of the debtor's creditors never gave rise to a disabling conflict of interest, disqualification may be warranted if they did not adequately disclose the nature and scope of the representation under Rule 2014.  If KLG was relying on Roy Brown's signature on the conflict waiver letter to cure and absolve KLG of any conflict arising from its representation of creditors, that waiver is immaterial as to whether KLG adequately disclosed the nature and scope of representation of specific parties so that the court and the uninformed debtor's creditors could make a determination as to whether they should be retained in this case.

Clearly, Mr. Fox knew that he needed to obtain a waiver from the principals of the debtor in regard to his relationship with the banks that also had a relationship with the Debtor.

However, that waiver agreement is between the debtor and KLG.  It does not waive KLG's duty to the court pursuant to Rule 2014.  For KLG to merely acknowledge in its Rule 2014 Affidavit that it had represented 483 of the debtor's creditors, without more, is inadequate disclosure. KLG's failure to point out which counsel it had worked with and merely that it represented certain creditors who remained creditors in the case belies the spirit of the mandate for adequate disclosure.  Even if this inadequate disclosure was unintentional and inadvertent, it does not excuse the failure to disclose possible conflicts of interest.  *See, In re BH&P, Inc.*, 949 F.2d 1300, 1317-1318 (3d Cir. 1991).

<u>CONCLUSION</u>

KLG failed to adequately inform the Court of its prior relations with various creditors and parties in interest in their application for retention as counsel to the Debtors as required pursuant to Rule 2014.

Since sanctions, if any, are within the discretion of the Court, there will be a hearing in this Court on May 16, 2013 at 11:00 am at which time the sanctions requested by Mr. Brown will be decided.  Any party who wishes to be heard on this subject shall file its written comments with the Court on or before May 10, 2013.  After this hearing, an Order will be entered in this case on all matters raised and addressed.



**Dated: Central Islip, New York**
**April 29, 2013**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**